**Affirmed and Majority and Dissenting Opinions filed April 5, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-10-01168-CR
_____

**BIONDI VERNARD ROLLE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1152256**

## MAJORITY OPINION

A jury convicted appellant Biondi Vernard Rolle of capital murder, and the trial court assessed automatic punishment of life imprisonment without parole. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (Vernon Supp. 2011). Appellant contends that a new trial is warranted because (1) the trial court erroneously admitted into evidence an autopsy photo of the murder victim's unborn child; and (2) the jury charge was erroneous. We affirm.

# BACKGROUND

Appellant and his wife moved into an apartment directly above the apartment of Guillermo Rubio and his girlfriend, Yvonne Sanchez. Although the couples initially had a friendly relationship, they eventually began feuding after a dispute over an amount owed for borrowed electricity. The dispute escalated to include several arguments involving yelling and one instance in which Rubio chased appellant up the staircase to his apartment and then kicked appellant's door.

Shortly before three a.m. on February 3, 2008, Rubio awoke to the sound of gunshots in his bedroom and saw a tall shadowy figure near his doorway. Rubio attempted to chase the individual but could not catch him. Rubio returned to his apartment, found Sanchez unresponsive, and called the police. Sanchez had been shot twice while asleep in her bed — once behind the ear at a downward angle from a distance of one to three feet, and once in the back. She died instantly.

Sanchez was almost six months pregnant when she was shot. Paramedics rushed Sanchez to the hospital in an effort to save the unborn child, but the child died shortly after delivery via postmortem cesarean section as a result of extreme prematurity.

Rubio informed the responding officer that he believed appellant was responsible for the shooting. Appellant's wife was home alone at the time of the incident; after appellant and his wife spoke via cell phone, appellant agreed to come home. Appellant walked up to the scene about 30 or 40 minutes later. Appellant was asked to accompany the officers to the police station, where he gave two statements. Appellant admitted in his second statement that he and two other men were present at Rubio's apartment, and that he kicked Rubio's door. Appellant claimed one of the other individuals entered Rubio's apartment and shot Sanchez.

Appellant was arrested after giving his second statement. The State charged appellant by indictment with capital murder, alleging that he caused Sanchez's death

2

during the course of committing or attempting to commit a burglary of a habitation owned by Rubio. A jury convicted appellant, and the trial court imposed a mandatory sentence of life imprisonment without parole. *See* Tex. Penal Code Ann. § 12.31(a) (Vernon 2011). Appellant filed a timely appeal.

## ANALYSIS

### I. Admission of Photograph

Appellant argues in his first issue that the trial court erred by admitting an autopsy photograph of Sanchez's unborn child into evidence during the trial's guilt-innocence phase because the danger of unfair prejudice substantially outweighed the photograph's probative value. *See* Tex. R. Evid. 403.

### A. Preservation

The State sought to introduce two photographs of Sanchez's unborn child during trial. Appellant's attorney objected, and the following exchange occurred:

> [APPELLANT]: I think these are still in order, and I'm not going to have any objection to State's Exhibits 45 through 58. I do have an objection to State's Exhibits 61 and 62 for several different reasons. One, they are – for the record, I'm identifying them as photographs of the dead baby, or the unborn baby. I think that they are going to inflame this jury. I think that a 404-403 review of this would find that the prejudice that they would show would outweigh any probative value.
>
> And I want to state for the record that the State's alleged not that my client killed more than one person in the same criminal episode. They've alleged burglary of a habitation, intentional killing during the course of committing burglary of a habitation. So I think they have sufficient evidence with photos of the deceased, Yvonne Sanchez, as named in the indictment. And I think this is extra, and they don't need it.
>
> And I also object to relevance and, also, object to materiality.
>
> [STATE]: Your Honor, we would at least ask one of the photos be introduced into evidence, because it is so tied in with this case. I mean, we have the autopsy of the child, and we've talked about the fact that she was

3

pregnant.   We have the doctor who's going to deliver — who delivered the baby as the next witness coming in.   It's all relevant to the case.

I mean, these murders occurred at the same time.   There is no – not – we're not stretching here.   We're not talking about a murder that occurred after or before.   These happened at the same time.   And it's so tied into the case that we ask at least one photo be introduced.

[THE COURT]:   Okay.   I'm going to overrule your objection and allow one photo be admitted.   Choose one.

[APPELLANT]:   Allow me to do that.   Well, I'd like to state my objection to them both; however, I understand the Court's ruling.   And so, what I would say is I would ask that 61 be the one to be admitted, 62 not be.

[THE COURT]:   61 will be admitted.   62 will not be admitted.   And your objection is noted for the record.

The eight-by-ten color photograph admitted as Exhibit 61 depicts the unclothed fetus on her back with a tube taped to her face, her legs tied together, her umbilical cord tied off, and multiple identification tags wrapped around her body.   The body as photographed is intact and does not appear to have been altered by autopsy procedures.

Appellant properly preserved error with his objection in the trial court; therefore, we must determine whether admission of the photograph constitutes reversible error.

### B.      Admissibility

Texas Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex. R. Evid. 403.   The admissibility of a photograph rests within the trial court's sound discretion based on a determination about whether the exhibit serves a proper purpose in assisting the finder of fact.   *Ramirez v. State*, 815 S.W.2d 636, 646–47 (Tex. Crim. App. 1991) (en banc).   Generally, photographs are admissible if verbal testimony as to matters

4

depicted in the photographs is also admissible. *Id.* at 647. An abuse of discretion occurs when the probative value of the photograph is small and its inflammatory potential great. *Id.*

A proper Rule 403 analysis includes the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). When reviewing the admission of a photograph, additional factors include the number of photographs, their size, whether they are in color or are black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether a body depicted in the photograph has been altered by autopsy. *Id.*

### 1.    Probative value

The Rule 403 test's first prong weighs in favor of exclusion because the photograph at issue had little probative value in relation to the offense with which appellant was charged. *See id.* at 492.

As noted in the trial objection, the indictment alleges that appellant intentionally caused Sanchez's death while in the course of committing or attempting to commit burglary. *See* Tex. Penal Code § 19.03(a)(2) (Vernon 2011). The indictment does not allege that appellant murdered more than one person during the same criminal transaction. *See id.* § 19.03(a)(7)(A). Nor does the indictment allege the murder of an individual less than ten years of age. *See id.* § 19.03(a)(8). Therefore, the autopsy photograph at issue had little if any bearing on a determination of guilt in connection with the offense with which appellant was charged. *See Prible v. State*, 175 S.W.3d 724, 735–36 (Tex. Crim. App. 2005) (trial court abused its discretion by admitting 12 color autopsy photographs of three children who died in a fire set to cover up the murder of their parents; admission of autopsy photos violated Rule 403 because "the cause of the children's death was not disputed" and "appellant was not charged with murdering them").

5

We also note that significant evidence pertaining to Sanchez's pregnancy and the unborn baby's death was admitted without objection during trial. The doctor who delivered the baby after Sanchez's death described the circumstances surrounding delivery and testified that few babies survive birth at that stage of gestation. The baby weighed less than one pound and had no heartbeat or respiration after delivery. The assistant medical examiner who performed the autopsy on Sanchez and on the baby testified that the baby died from extreme prematurity. An autopsy report on the baby was admitted without objection. Sanchez's sister testified without objection about Sanchez's pregnancy and the family's anticipation that the baby would be named Aracely.

Insofar as the State contends that evidence pertaining to Sanchez's pregnancy and the unborn baby had probative value, the autopsy photograph added little to the evidence already before the jury. *See Erazo*, 144 S.W.3d at 493 (photograph of unborn child "adds nothing helpful to the already-admitted testimony that the victim was pregnant, that the appellant knew she was pregnant, and that the fetus died as a result of the mother's death").

### 2. Ability to impress jury in an indelible way

The second factor to consider — the ability of the photograph to impress the jury in some irrational yet indelible way — also weighs in favor of exclusion. The State emphasizes that the trial court admitted only a single color photograph of the unborn baby out of more than 50 admitted photographs; that much of the unborn baby's body was covered by large identification tags; that the body had not been altered by autopsy; and that the unborn baby did not appear gruesome or altered aside from a tube attached to her nose and a tied-off umbilical cord. While these circumstances bear on whether admission of the autopsy photograph was harmful error, we do not believe as a threshold matter that they justify admission under Rule 403's second factor. *See Reese v. State*, 33 S.W.3d 238, 239 (Tex. Crim. App. 2000) ("The unborn child in the photograph appears tiny, innocent, and vulnerable. Society's natural inclination is to protect the innocent and the vulnerable.").

### 3. Time needed to develop evidence

The time needed to develop the evidence weighs in favor of admissibility. Although the photograph of the unborn child was published to the jury, and the State used the photograph while questioning a medical examiner witness, the questioning of the witness was relatively short regarding the photograph. The State offered the photograph for admission concurrently with more than fifteen other exhibits.

### 4. Proponent's need for the evidence

We must answer three questions when addressing this factor: (1) Does the proponent have other available evidence to establish the fact of consequence that the photograph is relevant to show? (2) If so, how strong is that other evidence? (3) Is the fact of consequence related to an issue that is in dispute? *Erazo*, 144 S.W.3d at 495-96.

Regarding these three questions, ample testimony during trial established that Sanchez was pregnant and that the fetus died. The State claims that the evidence was "necessary to show that appellant's murder of Ms. Sanchez caused the death of her infant daughter because she was too young to survive outside the womb." This fact was never in dispute, and both the medical examiner and the delivering physician testified that the fetus died due to prematurity.

The State did not have a strong need for admission of the photograph because (1) it had strong evidence and testimony other than the photograph to establish that Sanchez died; (2) the death of the unborn child was not an element of the offense as alleged in the indictment; and (3) Sanchez's death was not in dispute. This factor weighs in favor of exclusion.

### 5. Conclusion regarding admissibility factors

Given that three of the four factors weigh in favor of exclusion, we conclude that the trial court abused its discretion under Rule 403 by admitting an autopsy photograph of the unborn child that was substantially more prejudicial than probative.

7

## C. Harm

Having determined that the trial court abused its discretion in admitting a single photograph of Sanchez's unborn baby during the guilt-innocence phase of appellant's trial, we must perform a harm analysis. *Reese,* 33 S.W.3d at 243. The trial court's erroneous admission of the photograph is harmless error if, after reviewing the entire record, we have fair assurance the error did not influence the jury or had but a slight effect upon the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Reese*, 33 S.W.3d at 243.

Appellant argues that the erroneous admission of this photograph during the guilt-innocence phase of his trial was harmful because (1) the State placed "extensive closing-argument emphasis on the death of the fetus;" (2) the jury sent a note during deliberations requesting the State's "pictures;" and (3) "[e]vidence of appellant's guilt was not overwhelming" given the absence of eyewitness testimony that appellant fired the fatal shots.

Our harm analysis is informed by *Prible*, 175 S.W.3d at 737, in which the Court of Criminal Appeals addressed whether a new trial was warranted based on the erroneous admission of 12 color photographs taken during the autopsies of two seven-year-old children and one 22-month-old child who died from smoke inhalation in a fire set to cover up the fatal shooting of their parents. The photographs were admitted during the guilt-innocence phase of Prible's trial. *Id*. at 735. Prible was convicted of capital murder for intentionally and knowingly causing the deaths of the children's parents in the same criminal transaction. *Id*. at 726. Prible was not charged with murdering the children. *Id*. at 736.

Most of the 12 color photographs depicted the soot-covered "neck organs," tongue, larynx, and lungs of each of the three children. *Id*. Two of the photos showed the amount of carbon material that entered the stomachs of the 22-month-old child and one of the seven-year-old children. *Id*.

8

The Court of Criminal Appeals concluded that the trial court abused its discretion in admitting the 12 color autopsy photographs during the trial's guilt-innocence phase over Prible's Rule 403 objection. *Id*. "The State did not need the autopsy photographs of the children's dissected internal organs to fully explain the crime scene or to corroborate . . . testimony." *Id*. "Sufficient corroboration was provided by witness testimony, autopsy reports, crime scene photographs, and other autopsy photographs of the children's bodies before their internal organs had been removed." *Id*. "Furthermore, the cause of the children's death was not disputed." *Id*. "Most important, appellant was not charged with murdering them." *Id*. "Thus, the minimal probative value of the autopsy photographs at issue, if any, was substantially outweighed by the danger of unfair prejudice, confusion of the issues — by unduly focusing the jury's attention upon the deaths of the children rather than the deaths of their parents for which appellant was charged — and needless presentation of cumulative evidence." *Id*.

After concluding that the trial court abused its discretion under Rule 403, the Court of Criminal Appeals determined that the error was harmless under Texas Rule of Appellate Procedure 44.2(b). *Id*. at 737.[1]

In concluding that Prible's substantial rights were not affected, the court noted that other evidence in the record supported the State's closing argument to the jury emphasizing the children's deaths. *Id*. ("While appellant is correct and such argument is improper, we cannot see how the State's argument would have been affected had the autopsy photographs been excluded. Even the slightest reference to the crime scene and the children's deaths could still support that argument.").

The court also identified five additional factors supporting its harmless error determination: (1) "the jury had already seen and heard about the disturbing circumstances

---

[1] The Court of Criminal Appeals did not address whether the autopsy photographs affected the jury's deliberations during the punishment phase because the appellant raised no contention that they did so. *Id*. at 737 n.27.

9

of the children's deaths through properly admitted photographs and testimony; (2) "these photographs were not particularly gruesome or emotionally charged . . . they were clinical and depicted disembodied organs and tissue;" (3) the photos "pale in comparison to the properly admitted post-mortem photographs of Steve Herrera and Nilda Tirado whose deaths appellant was charged with intentionally causing;" (4) "the State, while emphasizing appellant's admission . . . that he had 'taken out' an entire family, did not dwell upon or emphasize the improperly admitted post-autopsy photographs of the children;" and (5) "these photographs have nothing to do with the disputed issue at trial of whether appellant murdered the children's parents as charged . . . do not affect the determination of appellant's guilt . . . and would not emotionally sway a factfinder until and unless he had found that appellant was the person who had caused the parents' deaths." *Id.*

We employ a similar analysis here.

As a threshold matter, there is room for discussion about whether any non-subjective means exist for analyzing the relative impact of a single color photograph depicting an intact fetus as compared to the impact of 12 color photographs depicting the dissected and soot-covered organs of two seven-year-olds and a toddler. One person may conclude that a dozen color photos depicting dissection performed upon young children are likely to have a greater emotional impact than a single photograph depicting a fetus that has not been altered by an autopsy. Another person may reach an entirely different and equally defensible conclusion. We will not attempt to characterize one type of image as being inherently more powerful than the other because any such characterization is largely subjective and personal. Suffice it to say that both types of images are powerful and fraught with the potential to provoke an unquantifiable emotional response.

These circumstances prompt us to focus instead on somewhat more objective factors to guide the harm analysis. This focus reveals close parallels between this case and *Prible*.

10

Here, as in *Prible*, the photograph at issue was admitted during the guilt-innocence phase of the trial. Furthermore, the State "did not dwell upon or emphasize" the admitted photograph. *See id.* The State never referenced Exhibit 61 during closing argument, either by number or description.

The State did refer more than a dozen times during closing to the death of Sanchez's unborn child. These references are amply supported by unobjected-to evidence pertaining to Sanchez's pregnancy and the unborn baby's death. This evidence includes an autopsy report on Sanchez's unborn baby, along with testimony from the assistant medical examiner who performed the autopsy; the doctor who delivered the baby after Sanchez's death; and Sanchez's sister. In light of this unobjected-to evidence, "we cannot see how the State's argument would have been affected had the autopsy photograph[] . . . been excluded." *Id.* The State also referenced another autopsy photo of Sanchez's unborn baby during closing that had not been admitted into evidence. However, by that time this jury already had "heard about the disturbing circumstances" of the unborn baby's death via evidence from multiple witnesses. The admissibility of that evidence has not been challenged on appeal. *Id.* These circumstances point to a minimal impact from a single accompanying photograph that was admitted into evidence as Exhibit 61. *See id.*

The jury note referencing "pictures" does not change this conclusion. The note is somewhat garbled. The jury requested "more copies of charge" along with "states pictures of both recorded statements" [sic] and "Defendants friday testimony" [sic]. It is not clear whether the jury intended to request "pictures of" something in particular. Even if the words "states pictures" are viewed in isolation, the trial court indisputably admitted more than 50 pictures as exhibits proffered by the State including photos from Sanchez's autopsy. This circumstance diminishes the likelihood that any one picture exerted a disproportionate influence on the jury's deliberations during the trial's guilt-innocence phase. *Cf. Reese*, 33 S.W.3d at 244 ("[T]his emotionally charged photograph is the *only photograph* that the State offered during the punishment phase." emphasis added)).

11

We also consider the record as a whole, along with evidence adduced during the guilt-innocence phase pertaining to the offense with which appellant was charged. *See Prible*, 175 S.W.3d at 737. Appellant does not challenge the sufficiency of the evidence to support the jury's verdict.

As noted above, Rubio was awakened before three a.m. by the sound of gunshots in his apartment bedroom. He saw the shadow of a tall person and gave chase but was unable to catch the running assailant. Rubio estimated that the assailant was between five feet eleven and six feet tall; he was unable to see any facial features; determine the assailant's race; or describe what the assailant was wearing. He noticed that the apartment door was open, and a couch he kept propped against the door had been pushed away. Rubio saw no one else in the apartment. Another witness told police she saw three people fleeing from the direction of Rubio's apartment wearing dark hoodie jackets.

Police recovered two .40 caliber Smith and Wesson shell casings from the bedroom. Police also saw and preserved a footprint on the apartment's front door.

Rubio told police he believed appellant was responsible for the shooting; described the escalating feud; and described an incident in which appellant shot off a gun days earlier. Police attempted to interview appellant but determined that he was not at home; they asked appellant's wife to help locate him, and appellant returned home about 30 or 40 minutes later after speaking with his wife via cell phone.

Appellant told police he owned a gun, which was retrieved from underneath a blanket in the trunk of appellant's car. It was a 9-millimeter gun that could not fire .40 caliber shells. A witness from the firearms section of the Houston Police Department crime lab opined that the bullets recovered from Sanchez's body were .40 caliber and were fired from the same gun, but were not fired from appellant's 9-millimeter gun. Appellant denied possessing or disposing of a .40 caliber gun.

Police also recovered a black hoodie from the trunk. Testing for gunshot residue on the hoodie retrieved from the trunk was negative. Appellant denied having worn the hoodie retrieved from the trunk.

Police noticed that the tread pattern on appellant's shoes was similar to the pattern of the footprint on Rubio's apartment door. Appellant's shoes were tested. A senior consultant with the forensic science training and consulting company that tested appellant's shoes testified that a "likelihood" exists that appellant's right shoe made the shoe print on Rubio's door. This determination was based on size, shape, tread design, wear pattern, and the presence of random nicks or cuts to the tread. The consultant also testified: "We are not saying conclusively that the right shoe that I was shown made the impression on the door. We're just saying that based on the agreement of the features that we see, the likelihood exists that the right shoe made the impression on the door."

Appellant acknowledged the existence of the feud when questioned by police, and he participated in two taped interviews with police. In the first interview, appellant denied participating in the crime and said he was with several friends — including Graham Stewart, Cory Wisnosky, and Aaron Fulton — at the time Sanchez was shot. Testimony established that appellant is six feet, one inch tall; Wisnosky is five feet, ten inches tall; and Fulton is five feet, seven inches tall.

Police interviewed Stewart, Wisnosky, and Fulton, and determined that discrepancies existed between their version of events and the version described in appellant's first statement. Police interviewed appellant again, and he gave a second recorded statement.

In his second statement, appellant admitted his presence at Rubio's apartment at the time of the shooting. He admitted kicking in the apartment door and carrying a weapon but claimed that Wisnosky entered the apartment and fired the fatal shots. Appellant could not explain why Wisnosky would shoot Sanchez.

13

Appellant testified at trial. He described the escalating feud and an incident in which Rubio challenged him to fight. He also described the incident in which Rubio kicked appellant's door two or three days before the murder.

According to appellant, he drove to Stewart's apartment after midnight on the night of the shooting where he met Stewart, Fulton, Wisnosky, and others. While at Stewart's apartment, he discussed the earlier incident in which Rubio kicked his door and, on the spur of the moment, decided to return to his own apartment building, kick Rubio's door, and run. Stewart, Fulton, and Wisnosky accompanied him on the ride back to his own building. Appellant took his 9-millimeter gun with him and put it in his waistband, but denied knowledge that anyone else had a gun.

Appellant denied having any agreement or discussions about what would happen after Rubio's door was kicked; denied asking anyone else to accompany him; and denied giving any instructions once they arrived. Appellant also testified: "I mean, I wanted to go over there, kick and leave; but in a sense, I did want to confront [Rubio]." Wisnosky did not know Rubio and Sanchez.

Appellant parked about 50 yards from his building; Fulton and Wisnosky accompanied appellant to Rubio's apartment while Stewart stayed with the car.

Appellant testified that he kicked Rubio's door once, causing it to open a couple of inches. He testified that Wisnosky then leaned into the door, pushed it open, and entered the apartment. Appellant denied seeing a weapon in Wisnosky's hand. Appellant testified that he "leaned in" and "stepped in" the apartment; asked Wisnosky what he was doing; saw nothing in the darkness; heard two shots; and took off running with Fulton.

Appellant reached the car first and left in it with Stewart. They met up with Fulton and Wisnosky a short time later at a nearby gas station, and appellant drove all four back to Stewart's apartment. Appellant remained there until summoned by his wife to return to his own apartment because the police were looking for him. Appellant acknowledged

14

lying to police in his first statement, but claimed that he told the truth in his second statement. He denied knowing that Sanchez was pregnant.

Appellant contends on appeal that harmful error from the admission of Exhibit 61 is evident on this record given that "[n]o eyewitness testimony was adduced that he fired the fatal shots." This contention fails in light of *Prible*. The Court of Criminal Appeals determined the erroneous admission of autopsy photos was harmless error notwithstanding that, as in this case, (1) the gun used to shoot the victims never was recovered; and (2) no eyewitness testified that Prible fired the fatal shots. *See Prible*, 175 S.W.3d at 728 n.3 & 729. The autopsy photos "do not affect the determination of appellant's guilt in this case and would not emotionally sway a factfinder until and unless he had found that appellant was the person who had caused the parents' deaths." *Id*. at 738. "In sum, we conclude that the erroneous admission of the autopsy photographs . . . did not affect appellant's substantial rights" during the guilt-innocence phase of his trial. *Id*. In light of the record described above, the same conclusion applies here.

We likewise reject appellant's contention that reversal is warranted under *Reese*, 33 S.W.3d at 244, and *Erazo v. State*, 167 S.W.3d 889, 891 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Both cases involve the admission during the punishment phase of photographs depicting a murder victim's unborn child. *See Reese*, 33 S.W.3d at 239 (eight-by-ten color photograph depicted murder victim in her casket with her unborn child, visible and wrapped in a blanket); *Erazo*, 167 S.W.3d at 889 (autopsy photograph of fetus removed from murder victim). Both cases concluded that the erroneous admission of these photographs was harmful error necessitating a new punishment hearing. *See Reese*, 33 S.W.3d at 244; *Erazo*, 167 S.W.3d at 890-91.

In so doing, *Reese* stressed that (1) the photograph at issue was the only one admitted during the punishment phase; (2) comments by the State's counsel at trial "seem[] to admit that the photograph was intended to inflame the jury and influence to make its decision on an improper basis;" and (3) the State "used and emphasized this photograph

15

during closing arguments." *Reese*, 33 S.W.3d at 244-45. *Erazo* also stressed that the State's argument "called special attention to the photograph of the dead fetus." *Erazo*, 167 S.W.3d at 890. "[T]he State twice referred to the erroneously admitted autopsy photograph, once specifying the exhibit number." *Id.* at 891. "The State also emphasized at least four times the importance of this photograph and the strong impact the State believed the photograph would have on the jury." *Id.* *Erazo* also considered that "the jury assessed the maximum possible punishment" after these arguments. *Id.*

The specific concerns about emphasizing the photograph that animated *Reese* and *Erazo* do not apply here, as discussed in detail above. *Erazo*'s additional concern about the jury's imposition of the maximum possible sentence is not germane to this case because the punishment was automatic. For these reasons, we conclude that *Prible* controls the harm analysis here in the context of the erroneous admission of a photograph during the guilt-innocence phase.

We overrule appellant's first issue.

## II.     Charge Error

In his second issue, appellant argues that he was egregiously harmed by an error in the jury charge based on transferred intent instructions. Appellant contends that the instructions erroneously omitted the burglary element in the transferred intent application paragraph.

The jury charge included the following instruction:

A person is nevertheless criminally responsible for causing the result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured, harmed, or otherwise affected.

Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Biondi Vernard Rolle, acting alone or with Cory Wisnosky and/or Aaron Fulton, as a party to the offense, in Harris County, Texas, on or about the 3rd day of February, 2008, did then and there unlawfully and

16

intentionally shoot a firearm at Guillermo Rubio, intending that death would occur to Guillermo Rubio, but instead, missed Guillermo Rubio and hit Yvonne Sanchez, causing the death of Yvonne Sanchez with the use of a deadly weapon, namely, a firearm, then you will find the defendant guilty of capital murder, as charged in the indictment.

Appellant did not object to the transferred intent language. The jury returned a guilty verdict on the capital murder charge.

The inquiry here involves a two-step process. When we review a claim of jury charge error, we first determine whether there is error. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If there is error in the charge and appellant objected to the error at trial, reversal is required if the error "is calculated to injure the rights of the defendant," which has been defined to mean that there is "some harm." *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). If the error was not objected to, it must be "fundamental" and requires reversal only if it was so egregious and created such harm that the defendant "has not had a fair and impartial trial." *Id.*

## A.    Error

A trial court may instruct the jury on the law of transferred intent as applied in a capital murder prosecution. *Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008); *Norris v. State*, 902 S.W.2d 428, 437 (Tex. Crim. App. 1995).

Appellant contends the instructions on transferred intent in the application portion are erroneous because they did not require the jury to find the elements of capital murder based upon a murder intentionally committed in the course of committing or attempting to commit a burglary. Appellant contends that "the omission of the crucial burglary element in the transferred intent application paragraph lessened the State's burden of proof and was erroneous." In assessing appellant's contention, we "examine the charge as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995).

17

A person commits the offense of capital murder "if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . burglary . . . ." Tex. Penal Code Ann. § 19.03(a)(2) (West. Supp. 2011). The indictment in this case alleges that appellant "on or about FEBRUARY 3, 2008, did then and there unlawfully . . . while in the course and committing and attempting to commit[] the BURGLARY OF A HABITATION OWNED BY GUILLERMO RUBIO, intentionally cause the death of YVONNE SANCHEZ by SHOOTING YVONNE SANCHEZ WITH A DEADLY WEAPON, NAMELY, A FIREARM."

The abstract portion of the jury charge tracked the statutory definitions of murder and capital murder.

The jury was instructed that "[a] person commits the offense of murder if he . . . intentionally or knowingly causes the death of another; or . . . intends to cause serious bodily injury and intentionally or knowingly commits an act clearly dangerous to human life that causes the death of an individual."

The jury was instructed that "[a] person commits the offense of capital murder if he intentionally commits murder, as hereinbefore defined . . . and the person intentionally commits the murder in the course of committing or attempting to commit the offense of burglary of a habitation." The jury further was instructed that "[a] person commits the offense of burglary of a habitation if, without the effective consent of the owner, he . . . enters a habitation with intent to commit a felony, theft, or an assault; or . . . enters a habitation and commits or attempts to commit a felony, theft, or an assault."

To convict of capital murder, the jury was instructed that "you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of burglary of a habitation owned by Guillermo Rubio, as alleged in this charge, but also that the

18

defendant specifically intended to cause the death of Yvonne Sanchez, by shooting Yvonne Sanchez, with a deadly weapon, namely, a firearm . . . ."  The jury also was instructed:

> [O]r you must find from the evidence beyond a reasonable doubt that the defendant, Biondi Vernard Rolle, with the intent to promote or assist in the commission of the offense of burglary of a habitation owned by Guillermo Rubio, if any, solicited, encouraged, directed, aided or attempted to aid Cory Wisnosky and/or Aaron Fulton in shooting Yvonne Sanchez, if he did, with the intention of thereby killing Yvonne Sanchez . . . .

The jury was further instructed:

> [O]r you must find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Biondi Vernard Rolle, entered into an agreement with Cory Wisnosky and/or Aaron Fulton to commit the felony offense of burglary of a habitation owned by Guillermo Rubio, as alleged in this charge, and pursuant to that agreement they did carry out their conspiracy, and while in the course of committing said conspiracy, Cory Wisnosky and/or Aaron Fulton intentionally caused the death of Yvonne Sanchez by shooting Yvonne Sanchez with a deadly weapon, namely, a firearm, and the murder of Yvonne Sanchez was committed in furtherance of the conspiracy and was an offense that should have been anticipated by the defendant as a result of carrying out the conspiracy.

This portion of the charge concluded: "[U]nless you so find, then you cannot convict the defendant of the offense of capital murder."

The transferred intent application paragraph subsequently stated that the jury could convict appellant of capital murder "as charged in the indictment" if it believed from the evidence beyond a reasonable doubt that appellant, "acting alone or with Cory Wisnosky and/or Aaron Fulton, as a party to the offense . . . unlawfully and intentionally [shot] . . . a firearm at Guillermo Rubio, intending that death would occur to Guillermo Rubio, but instead, missed Guillermo Rubio and hit Yvonne Sanchez, causing the death of Yvonne Sanchez with the use of a deadly weapon, namely, a firearm . . . ."

Viewing the charge as a whole, we reject appellant's contention that the charge was erroneous because "omission of the crucial burglary element in the transferred intent

19

application paragraph lessened the State's burden of proof . . . ." The disputed instruction referenced capital murder "as charged in the indictment" and thereby directed the jury to the charge that appellant "while in the course and committing and attempting to commit[] the BURGLARY OF A HABITATION OWNED BY GUILLERMO RUBIO" did "intentionally cause the death of YVONNE SANCHEZ by SHOOTING YVONNE SANCHEZ WITH A DEADLY WEAPON . . . ." The jurors heard the indictment read aloud twice, once at the beginning of voir dire and again at arraignment. As discussed above, the indictment's reference to burglary of a habitation was reinforced by additional instructions and definitions addressing burglary of a habitation as a required element of capital murder in this case. The jury answered: "We, the Jury, find the defendant, Biondi Vernard Rolle, guilty of capital murder, as charged in the indictment."

Given the reference in the indictment along with additional instructions and definitions, we do not believe the transferred intent application paragraph was confusing so as to mislead the jury or cause it to believe that the element of burglary was unnecessary to convict appellant of capital murder.

## B.     Harm

Even if it is assumed for argument's sake that the trial court erred in the transferred intent application paragraph of the jury charge, we conclude that appellant was not harmed by the alleged charge error.

Because appellant failed to object to any alleged charge error, reversal is warranted only if appellant was egregiously harmed. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). To determine "egregious harm," we examine "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id*. (citing *Almanza*, 686 S.W.2d at 171). The appellant must have suffered actual, rather than theoretical, harm. *Id*. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a

20

valuable right,' or 'vitally affect a defensive theory.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 172.).

With respect to the first two factors, we conclude that they do not support a determination of egregious harm based upon the transferred intent application paragraph.

As discussed above, the jury charge as a whole contained multiple references, definitions, and instructions regarding burglary of a habitation as the basis for capital murder. Thus, the charge did not mislead the jury or indicate that the element of burglary was unnecessary to convict appellant of capital murder.

During voir dire, the State announced its intent to establish capital murder by proving that the murder occurred in the course of a burglary: "[W]e're going to prove that the defendant, charged with intentionally causing the death of the individual, committed the murder intentionally in the course of committing or attempting to commit the felony offense of burglary." The overwhelming nature of the evidence at trial concerning the burglary element of capital murder in this case reinforces a determination that no egregious harm occurred based upon the absence of an explicit reference to burglary in the transferred intent application paragraph. The existence of an escalating dispute between appellant and Rubio was undisputed; in contrast, Wisnosky did not know Rubio or Sanchez. Appellant admitted to kicking in the door to Rubio's apartment; he also admitted that he "stepped in" while armed with a 9-millimeter handgun. Appellant drove Wisnosky, Fulton and Stewart to Rubio's apartment building; accompanied Wisnosky and Fulton to Rubio's apartment; and then drove them back to Stewart's apartment after the shooting.

With respect to the third factor, appellant emphasizes that the State referred to transferred intent during closing. The State argued, "If you believe the defendant intended to kill Guillermo Rubio but instead, in that dark room, by going up to the lump in the bed shot Yvonne Sanchez with the intent to have killed Guillermo Rubio, then he's still guilty of capital murder." The State continued, "[I]f you believe that the only difference

21

between what actually occurred and what he desired, contemplated or risked there, that a different person was injured, harmed or otherwise affected, he is still guilty of the named offense." The State added, "If you find the only things between the intent and the outcome is who got hurt, then the defendant is guilty."

We note that the State also referred multiple times during closing to burglary as an element of capital murder. The State explained that capital murder involves a situation in which "a defendant, with the specific intent to commit murder, commits a felony of burglary and then intentionally commits murder, here of Yvonne Sanchez or under transferred intent could also be of Guillermo Rubio." The State also argued:

> There are three ways that the defendant under this charge could be found guilty of capital murder. One, that he kicked in that door, that he, in the course of committing burglary, intentionally shot at Guillermo Rubio and killed Yvonne Sanchez, or that his buddy, CJ, did this, that he knew it was in the course of committing capital murder, and he assisted or even attempted to aid CJ in the commission of that offense, or that they went in to commit burglary, and in the commission of that burglary, the murder of Yvonne Sanchez should have been anticipated in the furtherance of that murder. So, although you're hearing those same terms over and over, those are the questions that you will be asked when you go back to deliberate.

These arguments underscore that burglary as an element of capital murder was repeatedly discussed and reinforced during closing.

In light of this record, we conclude that egregious harm has not been established in connection with the transferred intent application paragraph in the jury charge. We overrule appellant's second issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/     William J. Boyce
         Justice


Panel consists of Chief Justice Hedges and Justices Boyce and Christopher.   (Hedges, C.J. dissenting).

Publish — Tex. R. App. P. 47.2(b).