

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00099-CR

RENARD TILFORD TUCKER                                APPELLANT

V.

THE STATE OF TEXAS                                           STATE

----------

### FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In three points, Appellant Renard Tilford Tucker appeals his conviction for aggravated assault with a deadly weapon. We affirm.

## II. Factual and Procedural Background

On March 31, 2011, Shakena Ward, Brandon McElroy, Canota Wilson, and Brandon Thompson left McElroy's cousin's apartment and got into McElroy's

---

[1]*See* Tex. R. App. P. 47.4.

Jeep. Ward was driving, and McElroy was in the front passenger seat; Wilson and Thompson were in the back seat.

As Ward began to back up the Jeep, she heard someone shout, and looked back. Armed with handguns, Tucker; Lawarren Silas (also known as "Dwan" or "Juan"), who McElroy recognized[2] and who Ward later identified from a photo spread; and Shawn Fowler, who subsequently confessed to participating in the offense,[3] approached the passenger side of the Jeep. Fowler opened the front passenger door, Tucker stood at the right side passenger door, and Silas stood in front of the windshield. Ward said that the men were looking for someone.

When the Jeep's occupants said that they did not know whom the men were looking for, the three armed men opened fire. The Jeep's occupants tried to escape. Ward ran back toward the apartment and was shot in the eye, chin, and back; the shooting left Ward blind in her right eye. Tony Jones, who was outside a nearby apartment, was struck by a stray bullet that paralyzed him from the ribs down and caused his left leg to be amputated.[4] Jones did not see who shot him, and he did not know anyone involved in the shooting.

---

[2]McElroy subsequently told the investigating police detective that he owed Silas some money.

[3]Two of the handguns were later found in Fowler's apartment.

[4]At the time of the trial, Jones was unsure whether his right leg would also need to be amputated.

2

Police collected twelve bullet casings from the scene: seven were .40-caliber Smith & Wesson casings, and five were 10-millimeter Winchester casings. The trial court admitted a police diagram marking where each bullet casing and other pieces of evidence were recovered. The diagram showed a cluster of markings around where the Jeep had been, with the .40-caliber casings on one side, and the 10-millimeter casings on the other.

Based on identifications by Ward and McElroy—admitted at trial over Tucker's objections[5]—police obtained arrest warrants for Silas and Tucker, who were subsequently arrested at Fowler's apartment. Fowler accompanied the officers to the police station, confessed to being the third shooter, and consented to a search of his apartment, where police found two .40-caliber handguns, which a forensic scientist was later able to match to the .40-caliber cartridge casings found at the scene. The trial court also admitted three photographs of Ward's injuries over Tucker's objection that the photographs were gruesome, inflammatory, and irrelevant because it was uncontested that Ward had been shot in the eye.

The jury convicted Tucker of committing the aggravated assault with a deadly weapon of Jones. After Tucker pleaded true to the repeat offender

---

[5]Tucker objected that the other men in the photo spreads from which Ward and McElroy identified him did not resemble him based on differences in hairstyle and age.

allegation, the trial court assessed his punishment at fifty years' confinement, and this appeal followed.

## III.  Sufficiency

In his second point, Tucker argues that the evidence is insufficient to support his conviction.  Specifically, he asserts that the evidence fails to show that he intentionally or knowingly caused injury to Jones, that he knew Jones was anywhere around the area, or that the bullets could have travelled to Jones.

### A.  Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

### B.  Analysis

Tucker was charged with intentionally or knowingly causing bodily injury to Jones by shooting him with a firearm, a per se deadly weapon.  Tex. Penal Code Ann. § 1.07(a)(17)(A) (West 2011 & Supp. 2012), §§ 22.01(a)(1), 22.02(a)(2)

(West 2011).  The trial court instructed the jury on the law of transferred intent[6] and on the law of parties.  *See id.* §§ 6.04(b)(2), 7.02(a)(2) (West 2011); *see also Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999) (stating that in general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties), *cert. denied*, 529 U.S. 1070 (2000); *Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999) (stating that the statutory principle of transferred intent is raised when there is evidence that a defendant with the required culpable mental state intends to injure or harm a specific person but injures or harms a different person or both).

Here, the evidence shows that Tucker,[7] Silas, and Fowler surrounded McElroy's Jeep, opened fire on its occupants, and continued to fire as the vehicle's occupants tried to escape.  Their shots struck Ward and Jones and left

---

[6]The court of criminal appeals has stated:

> A classic example of proper application of transferred intent is the act of firing at an intended victim while that person is in a group of other persons.  If the intended person is killed, the offense is murder.  If a different person in the group is killed, the offense is murder pursuant to [section] 6.04(b)(2). . . .  In either case, there was one intent to kill and one resulting death.

*Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008).

[7]Ward and McElroy identified Tucker as one of the three men who surrounded the Jeep and fired on its occupants, and as to those identifications, we must consider all the evidence admitted at trial, even if we conclude that some of it was improperly admitted, when performing a sufficiency review. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

5

casings at the scene that were later matched to two of the guns used. Although Jones did not know anyone in the Jeep or any of the shooters, he happened to be outside when the men opened fire and was struck by one of the gunshots intended for the Jeep's occupants before he could run away. *See* Tex. Penal Code Ann. § 6.04(b)(2); *Manrique*, 994 S.W.2d at 647. Viewing all of the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to support the conviction, and we overrule Tucker's second point.

## IV. Identification Procedures

In his first point, Tucker asserts that the trial court erred by failing to suppress the in-court identification evidence because it was impermissibly tainted by an alleged improper pretrial photo spread that contained no one else who resembled Tucker.

### A. Standard of Review

We review de novo a trial court's ruling on whether the suggestiveness of a pretrial photo array may have influenced an in-court identification, considering the totality of the circumstances to determine whether "'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Gamboa v. State*, 296 S.W.3d 574, 581–82 (Tex. Crim. App. 2009) (quoting *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998)). We use a two-step analysis to determine whether the trial court correctly admitted an in-court identification: (1) whether the out-of-court identification procedure was impermissibly

6

suggestive and, if so, (2) whether the impermissibly suggestive procedure gave rise to the substantial likelihood of irreparable misidentification. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996). A photographic array is not impermissibly suggestive merely because each photograph can be distinguished in some manner from the accused's photograph. *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Further, the appellant bears the burden to show by clear and convincing evidence that the pretrial identification was impermissibly suggestive. *Madden v. State*, 799 S.W.2d 683, 695 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 954 (1991). If the totality of the circumstances reveals no substantial likelihood of misidentification despite the suggestive identification procedure, the identification testimony will be deemed reliable and therefore admissible, as "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977)). Factors we consider in determining the likelihood of misidentification include the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the witness's level of certainty at the time of the confrontation, and the length of time between the offense and the confrontation. *Gamboa*, 296 S.W.3d at 582.

7

## B. Development of the Photo Spreads

Prior to the admission of the identification evidence, the trial court held a hearing outside of the jury's presence. During the hearing, Fort Worth Police Detective Dan Fenter testified that before separately showing the photo spreads to Ward and to McElroy, he had admonished them that the person who was involved might or might not be in the photo spread and that hair length and skin shade could be skewed because of lighting or changes in hair length or facial hair between the time of the photo and the way the suspect looked now. Because McElroy had told Detective Fenter that he had seen Tucker before the shooting and knew him by a nickname, Detective Fenter showed McElroy the photo spread of Tucker to confirm who he was talking about.

Before the jury, Detective Fenter testified that Wilson had identified Silas by the nickname "Juan" and gave him "Juan's" phone number, which he then used to identify Silas. Detective Fenter put together a photo spread containing Silas and four or five additional photo spreads of Silas's known associates that matched the descriptions of the other two suspects. McElroy, who was hiding from the shooting suspects at a hotel, identified Silas from one of the photo spreads and identified Tucker from one of the others. McElroy identified Silas "right off the bat" as "Juan," and then picked Tucker out as "the big guy."

Detective Fenter explained to the jury that when selecting photographs to include, he went by "a general range of age and body style and hairstyles, if it's possible," and that in this case, he made sure to include people with long hair

8

and short hair because he had received a description of Tucker as having short hair. He testified that he tried to match the physical descriptions that he had received. Detective Fenter said that when he saw Tucker just days after the shooting, Tucker's hair was short.

Detective Fenter stated that his partner showed Ward the photo spreads containing Silas's photo and that she identified Silas. Detective Fenter subsequently showed Ward the photo spread containing Tucker's photo after McElroy had already given him a positive identification of Tucker. Ward, who was still in the hospital when she viewed the photo spreads, identified Tucker immediately.

The identifications by Ward and McElroy were made at separate times less than a week after the shooting. Prior to viewing the array, both were instructed that the photographs might or might not include a picture of the individual under investigation and that they should not focus on easily-altered hair length or facial hair. When Detective Fenter assembled the photographs, the description he had of Tucker was that of a heavy-set black male with short hair. While both witnesses were under fire at the time of the crime, both were certain in their identifications, and McElroy, who owed Silas money, recognized Tucker from before the offense.

An examination of the photographic array shows that all six individuals depicted are African-American. Three individuals have short hair, one has medium length hair, and two—including Tucker—have long hair. All of the

9

individuals are pictured from the shoulder up, preventing an accurate ascertainment of their build, but their facial features all seem to depict medium-to-heavy-set men in the same general age bracket—three appear younger and three appear older, but all appear to be in their twenties or early thirties. Adding credibility to the accuracy of the identification is that Tucker is one of the two individuals depicted with long hair despite the fact that he had short hair at the time of the shooting. Under these circumstances we cannot say that the pretrial identification was "impermissibly suggestive,"[8] and we overrule Tucker's first point.

---

[8]While Tucker argues that McElroy testified that none of the other photos in the photo spread looked like him, during cross-examination, McElroy said that as soon as the photos were put in front of him, "there was no question in [his] mind that this was the man that did that," even though he did not see Tucker "on a day-to-day basis to have a full description of him." McElroy then testified as follows:

> Q. Let me ask you about this State's 63, which is your photo array, which has already been admitted. *This is the person that you know as Mr. Tucker*, right?
>
> A. Yeah.
>
> Q. *This is the person that you know that is friends with Mr. Silas*, right?
>
> A. Right.
>
> Q. And he looks nothing like the other five people, does he?
>
> A. No, he does not.
>
> Q. Doesn't look anything like that. And *you knew him as Mr. Silas's friend*, correct?

10

## V. Photographic Evidence

In his third point, Tucker asserts that the trial court erred by admitting photographs of Ward.

### A. Standard of Review

When determining whether photographic exhibits were properly admitted, the question is not whether the exhibits are more prejudicial than probative, but rather whether the probative value of the photographs is substantially outweighed by the danger of unfair prejudice. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App.), *cert. denied*, 534 U.S. 855 (2001); *see also* Tex. R. Evid. 403. We review a rule 403 decision for an abuse of discretion. *Salazar*, 38 S.W.3d at 151; *Narvaiz v. State*, 840 S.W.2d 415, 428–29 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 975 (1993); *see also Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g).

In reviewing a trial court's ruling on the admissibility of photographic evidence, we consider not only the general rule 403 factors—the probative value of the evidence; the potential to impress the jury in some irrational, yet indelible, way; the time needed to develop the evidence; and the proponent's need for the

---

A. Yes, I did.

[Emphasis added.] Instead of demonstrating suggestiveness, within context, McElroy's testimony shows that he recognized Tucker, but not the other men in the array, because he knew Tucker before the shooting, which is corroborated by Detective Fenter's testimony during the hearing outside the jury's presence that he showed the photo array to McElroy to confirm that Tucker was the person McElroy was talking about.

11

evidence—but also the following nonexclusive list: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *King v. State*, 189 S.W.3d 347, 355 (Tex. App.—Fort Worth 2006, no pet.).

**B. The Photographs**

The three photographs at issue are State's Exhibits 35, 36, and 37. State's Exhibit 35 is a photograph of the right side of Ward's face where she had been shot in the eye. The photograph depicts Ward with her eyelid closed and shows no injury discernible other than some blood that had trickled toward the back of her head from her eye. State's Exhibit 36 is a photograph of the underside of Ward's chin and depicts the bloodier wound presumably caused by a gunshot to her chin. State's Exhibit 37 depicts the same chin wound from a different angle, which makes it appear larger but less bloody.

**C. Analysis**

Because the State proceeded under the theory of transferred intent, it had to prove that Tucker had intended to commit aggravated assault with a deadly weapon. Ward's injuries are such probative evidence. Further, the three photographs themselves, which are close-up shots of Ward's head, are not overly gruesome, horrific, or likely to make some indelible impression on the

12

jurors, unlike the photograph in *Rolle v. State*, 367 S.W.3d 746 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd), upon which Tucker relies in his argument.[9] Therefore, because their prejudicial weight, if any, does not overcome their probative value with regard to the transferred-intent issue, we hold that the trial court did not abuse its discretion by admitting the three photographs, and we overrule Tucker's third point.

## VI. Conclusion

Having overruled Tucker's three points, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 30, 2013

---

[9]In *Rolle*, the court held that the admission of a single color photo of the victim's unborn child was error when, among other things, the victim was killed during the course of the burglary of a habitation, the photograph had little probative value in relation to the charged offense of capital murder, and the photograph of the tiny, innocent, and vulnerable unborn child had the ability to impress the jury in some irrational yet indelible way. *Id.* at 749–51.