**Devin Donell FIELDS, Appellant**

v.

**The STATE of Texas, Appellee**

**No. 04–15–00585–CR**

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: November 30, 2016

Michael D. Robbins, Assistant Public Defender, San Antonio, TX, for Appellant.

Mary Beth Welsh, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: Patricia O. Alvarez, Justice Luz Elena D. Chapa, Justice Jason Pulliam, Justice

## OPINION

Opinion by: Jason Pulliam, Justice

A jury found Devin Fields guilty of the offense of capital murder for the murders

of Baby Girl Harrison and her unborn child. The State did not seek the death penalty, therefore, the trial court sentenced Fields to life imprisonment. On appeal, Fields argues the evidence is insufficient to support his conviction and the trial court erred when it admitted into evidence a note written by an accomplice witness, the crime scene video, and an autopsy photograph over his objections. The trial court's judgment is affirmed.

## I. BACKGROUND

On July 4, 2013, Fields knocked on the apartment door of Stephon Finnell, a man Fields believed was responsible for the recent burglary of his apartment. Finnell's girlfriend, Baby Girl Harrison, answered the door. Fields opened fire with a .45 caliber handgun, hitting Harrison twice in the chest. Harrison, as well as her unborn child, died as a result of the gunshot wounds.

The record in this case shows Fields and Finnell grew up in the same neighborhood, were members of the same gang, and sold drugs together. In the months prior to the offense, Finnell who already had one child with Harrison, lived with Breanna Ancira and introduced Fields to Ancira. A short time before the offense occurred, Finnell reunited with Harrison. Fields informed Ancira the other couple reunited because Harrison was pregnant with Finnell's child. Fields and Ancira subsequently became romantically involved.

The night the offense occurred, the apartment Ancira and Fields shared was burglarized. The burglars stole a television and a safe containing Fields's drugs, money, and gun. According to testimony from the couple's downstairs neighbor as well as a roommate and Ancira, Fields believed Finnell was responsible for stealing the safe because Fields had declined to help Finnell rob someone else earlier in the day. Although the downstairs neighbor called the police, Fields refused officers entrance into the apartment to investigate. Ancira testified Fields was very angry. Ancira drove Fields to his brother's home where Fields obtained a handgun from his brother. Fields emptied the handgun's clip and wiped each of the bullets clean before reloading the clip. Fields then directed Ancira to drive him to the apartment complex where Finnell lived.

Fields ordered Ancira to wait for him. Ancira watched through the car window as Fields argued with an unknown person, yelling, cursing, and gesturing at the other person. Fields moved out of Ancira's line of sight. Shortly thereafter, Ancira heard three gunshots. Fields ran back to the car and directed Ancira to drive away. Fields informed Ancira, "I think I just killed that bitch." Ancira testified Fields told her, "Before the bitch could even get my name out, I started shooting." According to Ancira, Fields ranted angrily and blamed Harrison for Finnell committing the burglary. According to Ancira and officers who responded to both the burglary and the murder scenes, the shooting occurred within an hour of the burglary being reported.

Later in the day, when Ancira told Fields she believed Harrison was dead, Fields replied, "Of course she's dead. I shot her with a [f'ing] .45 ... she got shot with a .45, of course she would be dead." Fields also told others he shot through the apartment's door and that Finnell should have known what would happen when Finnell stole from him. Fields disassembled the handgun and attempted to dispose of it in concrete.

According to Ancira, Fields forced her to go to Houston with him while leading others to believe they had fled to Corpus Christi. Ancira testified Fields threatened Ancira, her toddler daughter, and her family with death if Ancira spoke with the

police about the offense. Fields also told Ancira she would be jailed, because she was the only one who knew what happened and she would be considered an accomplice. Fields additionally created a story for Ancira to tell police if she was questioned, and further intended to marry Ancira because he believed Ancira would not be able to testify against him if they married.

Following his arrest and detention, Fields admitted to his jail cellmate he went to the home of a close friend and shot the woman who opened the door. Fields told his cellmate he shot the woman twice with a.45 using hollow-point bullets and then later put the gun in cement.

A grand jury indicted Fields for the offense of capital murder, alleging Fields caused the deaths of two individuals during the same criminal transaction. The District Attorney offered Ancira transactional immunity in exchange for her testimony against Fields. A jury found Fields guilty as charged in the indictment, and the trial court sentenced Fields to life imprisonment.

This appeal followed.

## II. Sufficiency of the Evidence

In his first issue, Fields argues the State failed to prove it was his conscious objective or desire to kill Harrison or Harrison's unborn child.

### A. Standard of Review

When examining the sufficiency of the evidence, this court considers all the evidence in the light most favorable to the conviction to determine whether, based on the evidence and reasonable inferences therefrom, a rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Merritt v. State*,

368 S.W.3d 516, 525 (Tex. Crim. App. 2012).

As the factfinder, the jury is the exclusive judge of witness credibility and the weight of the evidence. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). The jury is permitted to draw any reasonable inferences from the evidence so long as the inference is supported by the record. *Id.* Further, the reconciliation of conflicts in the evidence is within the factfinder's exclusive province. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). If a record supports conflicting inferences, this court presumes the factfinder resolved the conflicts in favor of the prevailing party and therefore defers to that determination. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Canida v. State*, 446 S.W.3d 601, 605 (Tex. App.–Texarkana 2014, no pet.).

### B. Application

A person commits the offense of capital murder if he commits murder and murders more than one person during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7)(A) (West Supp. 2016). The Penal Code definition of a "person" includes "an individual," which is defined as "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." *Id.* §§ 1.07(a)(26), (38); *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007).

■ Therefore, to obtain a capital murder conviction, the State was required to prove Fields intentionally or knowingly caused the death of Baby Girl Harrison by shooting her and, during the same criminal transaction, also intentionally or knowingly caused the death of Harrison's unborn child while the unborn child was in gestation. Further, to support a conviction for capital murder under section 19.03(a)(7)(A), the State was required to establish discrete, specific intent to kill with regard to each death. *Ex parte Norris*, 390 S.W.3d 338, 340 (Tex. Crim. App. 2012).

■ The jury may infer the intent to kill from a defendant's acts, words, or conduct, as well as from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If a deadly weapon, such as a firearm, is used in a deadly manner, the inference is almost conclusive the defendant intended to kill. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993).

Medical examiner, Dr. Samantha Evans, confirmed Harrison was approximately 21–22 weeks pregnant. Dr. Evans testified Harrison's death was caused by two gunshot wounds and the death of the unborn fetus was caused by the death of the mother. Dr. Evans described the first gunshot wound as a typical entrance wound caused by a bullet travelling in a front to back and steeply downward trajectory. The bullet fractured Harrison's collar bone, lacerated a major blood vessel in her mid-chest area, and lacerated part of her right lung before continuing through her body to injure her spinal cord. According to Dr. Evans, evidence of gunpowder stippling surrounded the entrance of the first gunshot wound, which Dr. Evans explained meant flecks of unburnt gunpowder grains came into contact with the skin. Dr. Evans testified the stippling was caused by a gun being fired from no more than three to four feet away.

Dr. Evans described the second gunshot wound as atypical. The bullet that caused the second wound travelled in a front to back and right to left, steeply downward trajectory. According to Dr. Evans, the bullet passed through Harrison's breast, the front part of her left chest cavity and into her abdomen, injuring her liver and spleen. During the autopsy, Dr. Evans discovered paint chips near the entrance of the second gunshot wound that were consistent with the paint from outside the apartment door. Dr. Evans additionally collected paint chips from Harrison's hands that were consistent with the paint from the inside of the apartment door.

Ancira and Fields's roommate, Desiree Schrimsher, and Fields's cellmate, Christopher Uridales, testified Fields knew before the shooting that Harrison was pregnant. Schrimsher testified Fields often reminded Ancira that Harrison was pregnant and the pregnancy was the reason Finnell left Ancira for Harrison.

Uridales testified Fields told him Harrison, who Fields described as Finnell's "baby mama" was pregnant which was why Finnell had gone "back and forth to" Harrison. Uridales additionally testified Fields described the offense to him in the following way:

> [He went] to one of his close friend's house. And when the door was opened, he shot that lady, and told me he shot her twice, you know, one in the stomach, closer to the shoulder blade, and she had flipped over, kind of went backwards.
>
> * * *
>
> He told me it was a .45. And later on, it went into concrete . . . the bullets were hallow (sic) points.

The jury heard testimony that Fields knew Harrison was pregnant and living with Finnell. Although Fields asserted he went to Finnell's apartment simply to recover his property, the State presented testimony that Fields went to the apartment carrying a loaded weapon. The jury also heard testimony that Fields knew it was Harrison who opened the door and knew he was shooting at Harrison when he fired his gun. There was also testimony Fields was aware of the damage the caliber handgun he carried caused. Finally, the jury heard testimony of Fields's own characterizations of the offense as he related it to others.

The jury was within its right as the factfinder to find from the testimony that Fields knew Harrison was pregnant and the one to open the door. The jury was also within its right to find Fields knew he was shooting at Harrison when he fired the gun. When viewed in the light most favorable to the verdict, a rational factfinder could have found Fields intentionally or knowingly caused the death of Baby Girl Harrison and her unborn child in the same criminal transaction. Consequently, this court concludes the evidence in this case is sufficient to sustain the jury's finding that Fields committed the offense of capital murder.

Issue one is overruled.

### III. Admissibility of Evidence

In his second, third, and fourth issues, Fields asserts the trial court erroneously admitted various pieces of evidence.

### A. Standard of Review

■ An appellate court reviews the trial court's decision on the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed. *Id.* The trial court is afforded "great discretion" in its evidentiary decisions because "the trial court judge is in a superior position to evaluate the impact of the evidence." *Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990) (en banc).

### 1. Ancira's Note

■ In his second issue Fields contends the trial court erred by admitting State's Exhibit No. 13, a note written by Ancira.

Prior to fleeing San Antonio, Fields allowed Ancira to visit her daughter at daycare. Rather than going to the daycare facility, Ancira went to the home of a friend where she penned a note to her parents and brother. During Breanna's testimony, the State offered the note as her present sense impression the afternoon following the offense. Fields objected on the basis of hearsay and bolstering. The State responded the note was not being offered "for the truth, [but] to show her state of mind." The trial court overruled Fields's objection, and the note was admitted. Ancira testified the note read:

> It says: If anything happens to me (Breanna Ancira) please, the money in my bank account, please give it to my mother, Holli Windham, and also let her have my daughter. It says: I love Damira and everyone. Please just take care of my baby. She is innocent to everything in this life. And I love you mom and I'm sorry for my wrongs but I am innocent. And I told my father: Don't be sad. And I told my brother to stay strong because I'm not going to be gone forever and revenge won't help. It says: I love you. Just make sure Damira knows I love her. And it says: I will watch over her,

and I love you mom and dad. If something happens to me, get the money and move everyone. And it says just, Love, Breanna. It says my name and I put my social security number.

 Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally inadmissible unless a statute or the Rules of evidence provide a specific exception permitting its admission. TEX. R. EVID. 802. Rule 803(1) provides an exception for a present sense impression. TEX. R. EVID. 803(1). A present sense impression is a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. *Id.* The rationale for the present sense impression exception is that the contemporaneity of the statement with the event it describes eliminates the danger of faulty memory and insincerity. *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008).

The primary purpose of the note was to show Ancira's fear for her own safety, as well as the safety of her daughter and her parents. The note states Ancira's wishes regarding her daughter and bank account and advises her family of her love.

 Although Ancira's note provides insight into Ancira's wishes regarding her bank account and the care of her daughter and lends support to Ancira's testimony that she feared for her life, the note does fall within the present sense impression exception to the hearsay rule. According to Ancira's testimony, the note was written shortly after the offense, but before Fields and Ancira fled San Antonio. Ancira testified her instructions to her friend were to give the note to her parents if she was not heard from in three days. Ancira's testimony, as well as the wording of the note

itself, indicate Ancira was able to formulate and carry out a plan to leave her family a note. "Once reflective narratives, calculated statements, deliberate opinions, conclusions, or conscious 'thinking-it-through' statements enter the picture, the present sense impression exception no longer allows their admission." *Fischer v. State*, 252 S.W.3d 375, 381 (Tex. Crim. App. 2008). " 'Thinking about it' destroys the unreflective nature required of a present sense impression." *Id.* Accordingly, this court concludes the trial court erroneously admitted State's Exhibit No. 13, the note written by Ancira.

 Having determined the trial court abused its discretion, this court must next determine whether the error is reversible. *See* TEX. R. APP. P. 44.2(b). The admission of inadmissible hearsay testimony is non-constitutional error, and it will be considered harmless if, after examining the record as a whole, this court is reasonably assured the error did not influence the jury's verdict or had but a slight effect. *Id.*; *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004).

Immediately prior to the admission of the note, Ancira testified regarding her fear for her own safety, as well as her fear for the safety of her daughter and other family members. Ancira testified she was threatened by Fields and feared for her life. Schrimsher also testified Ancira was obviously fearful following the offense and spoke of the worry Fields would shoot Ancira as he shot Harrison. Further, Uridales testified Fields admitted to threatening Ancira and her daughter to maintain control over Ancira. Finally, Ancira testified she wrote the note and about the contents of the note without objection.

Accordingly, having considered the record as a whole, this court is reasonably assured the trial court's erroneous admis-

sion of the evidence had but a slight effect, if any effect at all, on the jury's verdict. *See Garcia*, 126 S.W.3d at 927.

Issue two is overruled.

## 2. Crime Scene Video and Autopsy Photograph

In issues three and four, Fields contends the trial court erred by admitting State's Exhibits No. 41A, the crime scene video, and No. 89, an autopsy photograph of the unborn-child victim. Specifically, Fields alleges the prejudicial nature of the video and photograph substantially outweigh their probative value. *See* TEX. R. EVID. 403.

■■■■■ When evaluating whether the trial court erred in admitting a relevant photograph or video into evidence, an appellate court's review is limited to determining whether the probative value of the photo or video is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009); *see also* TEX. R. EVID. 1001(a) (indicating videos are treated in the same matter as photographs). A court may consider many factors in determining whether the probative value of photographs or videos is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in black and white or color, whether they are close-up, and whether the body depicted is clothed or naked. *Id.* This list, however, is not exhaustive. *See id.* The availability of other means of proof and the circumstances unique to each case should also be considered. *Id.*

### a. Crime Scene Video

■■ The crime scene video was offered into evidence during the testimony of Crime Scene Investigator Yvonne Diaz. Fields objected the video was repetitive and the "prejudicial effect is greater than any probative value." After viewing the video outside the presence of the jury, the trial court sustained Field's objection in part, ruling the State could show the video from time stamp 00:00 to 10:12. The State redacted the portions of the video following time stamp 10:12 and tendered the redacted video as State's Exhibit 41A. Fields renewed his objection to the admission of the redacted video, and the trial court overruled the objection.

In reviewing the crime scene video, this court notes the video is in color and does not include audio. The video, which is ten minutes and twelve seconds long, depicts the entirety of the crime scene. The video begins outside the apartment in which Harrison was shot and continues throughout the apartment, ending with views of the injuries to Harrison's body.

The Court of Criminal Appeals has held video and still photographs are not entirely cumulative of each other. *Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001). The video in this case offers a panoramic view of the scene depicting the dimensions, size, and close proximity of the crime scene not offered by photographs. *See id.* Fields also argues the video was unfairly prejudicial. However, the video in this case does nothing more than reflect the gruesomeness of the offense, which is not a sufficient reason for excluding evidence. *See id.*

Accordingly, this court concludes the probative value of the crime scene video admitted as State's Exhibit No. 41A was

not substantially outweighed by the danger of unfair prejudice.

Issue three is overruled.

### b. Autopsy Photograph

■■■ Prior to the testimony of Medical Examiner Dr. Samantha Evans, the trial court held a hearing regarding the admissibility of the autopsy photographs. Fields objected to admission of State's Exhibit No. 89, the autopsy photograph of Harrison's unborn child, because identification was not an issue and a description to the jury would be sufficient. Fields further argued the photograph was inflammatory and highly prejudicial. The trial court indicated it conducted a balancing test and found the probative value of the autopsy photograph outweighed the danger of unfair prejudice.

State's Exhibit No. 89 is a color photo depicting the unborn-child victim lying on its side with its umbilical cord attached to the placenta. The table on which the unborn-child victim is lying is substantially covered with red-tinged liquid and the unborn-child victim has not been cleaned. A portion of a ruler can be seen in the corner of the photograph.

■■■ Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). The photograph in question is undeniably gruesome. However, the photograph shows the second victim for whose death Fields was on trial. Further, the photograph demonstrated an element of the offense the State was required to prove to obtain a conviction. In *Erazo v. State*, the Court of Criminal Appeals addressed the admission of an autopsy photograph of the victim's unborn child during the punishment phase of Erazo's trial. *Erazo v. State*, 144 S.W.3d 487,

493 (Tex. Crim. App. 2004). The *Erazo* court found the admission of the photograph in question was erroneous because it was an autopsy photograph of an unborn child "whose death the defendant [was not] on trial [for]," rather than the mother, the actual victim. *Id.* at 494. The *Erazo* court, in discussing cases that permitted the admission of autopsy photographs over a Rule 403 objection, stated: the "photographs in the cases cited above were helpful to the juries in those cases because they showed" the victim. *Id.* "As a result, these photographs added something logical and relevant that made the photographs more probative than prejudicial." *Id.* In this case, the State was permitted to introduce an autopsy photograph of the actual victim, which as noted by the *Erazo* court is relevant. *See id.*

This court concludes the trial court did not abuse its discretion in admitting the autopsy photograph of the unborn-child victim. Although the photograph is gruesome, it is such simply because of the nature of the offense. The State did not admit any other photographs of the unborn-child. Considering the factors listed in *Young*, as well as the circumstances particular to this case, this court concludes the autopsy photograph was not so prejudicial that it overcame its probative value. *Young*, 283 S.W.3d at 874. Fields's claim that the photograph had a significant prejudicial effect outweighing its probative value is not supported by the record.

Issue four is overruled.

### CONCLUSION

Based on the forgoing reasoning, the judgment of the trial court is affirmed.

Concurring Opinion by: Luz Elena D. Chapa, Justice

Luz Elena D. Chapa, Justice, Concurring

I agree with the majority that the State presented legally sufficient evidence to support the jury's verdict of capital murder. I also agree that the trial court did not commit harmful error by admitting the crime scene video and Breanna's note. I write separately because in my opinion the slight probative value of the autopsy photo of Baby Girl Harrison's "unborn child"[1] was substantially outweighed by its unfair prejudice and the trial court abused its discretion in admitting it. However, because I conclude the error was harmless, I concur in the court's judgment.

Over Fields's objection under Texas Rule of Evidence 403, the trial court admitted State's exhibit 89, the autopsy photograph of the deceased unborn child. The color photograph shows the unclothed victim lying on its side on a table with the umbilical cord still attached to the placenta. The table is covered with red liquid. The majority accurately describes the photograph as gruesome. The admitted autopsy photos were so grossly inflammatory that the prosecutor felt the need to state, before publishing them, "I just want to warn the spectators that these photos are graphic and we would urge anybody that does not want to see them to please leave the courtroom."

In reviewing the trial court's evidentiary ruling under rule 403, we consider (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *Montgomery v. State*, 810 S.W.2d 372, 380–90 (op. on reh'g).

When the evidence consists of photographs, we also consider the number and size of the photographs, whether they are in color, whether they are gruesome, whether the body depicted is clothed or naked, and whether the body has been altered by autopsy. *Erazo*, 144 S.W.3d at 489. "An abuse of discretion occurs when the probative value of the photograph is small and its inflammatory potential great." *Rolle v. State*, 367 S.W.3d 746, 750 (Tex. Crim. App. 2012).

*The probative value of the evidence*

The State and the majority rely exclusively on the alleged probative value of the evidence to justify its admission in the trial of this case. The majority holds that because the State was required to prove as an element of its case that Fields's actions caused the death of the unborn child, the photograph is logically relevant to the State's case and helpful to the jury. However, the photograph added little probative evidence to the evidence already before the jury. The State had presented uncontroverted evidence that Baby Girl Harrison was pregnant, that Fields knew she was pregnant, that the unborn child was otherwise healthy, and that it died as a result of Baby Girl Harrison's death. The unborn child was not struck by any of the bullets, and thus State's exhibit 89 did not show any gunshot wounds.

"A crime-scene photograph or an autopsy photograph is not admissible simply to show the death of the individual. These photographs are admissible despite the fact, *and because*, they show more than the testimony. But that 'something more' must be relevant and helpful to the jury." *Erazo*, 144 S.W.3d at 493. As noted by the majority, the Court of Criminal Appeals in

---

1. Under the Texas Penal Code, the definition of "person" includes an "individual," which includes "an unborn child at every stage of gestation from fertilization until birth." TEX. PENAL CODE ANN. § 1.07(a)(26), (38) (West Supp. 2016).

*Erazo* discussed several cases in which autopsy photographs of unborn children were held admissible over a rule 403 objection. The *Erazo* court found that in each of those cases the photographs showed "something more," making them helpful to the jury, either because they showed the wounds suffered by the victim or demonstrated an element of the case beyond a deceased victim. *Id.* at 493–94. Contrary to the majority's suggestion, the court in *Erazo* did not hold the photographs in those cases were admissible *merely* because they showed a named victim of the charged offense. *See id.* at 494.

Nevertheless, I agree that because the unborn child was a charged victim in this capital murder case, the photograph was relevant. But because the photograph did not demonstrate "something more" that the State was required to prove or that was in dispute, it was not particularly helpful to the jury and its probative value was slight.

*Ability to impress the jury in some irrational yet indelible way*

The State argues that autopsy photos depicting only the injuries that caused death and not mutilation caused by the autopsy itself, are not unfairly prejudicial. However, in this case, the unborn child's death was caused by the mother's death. The photograph does not depict the injuries that caused the death and the medical examiner did not use the photograph to explain how or why the unborn child died. Rather, the photograph depicts a small unborn child with the umbilical cord attached to the placenta, all of which had been removed from the mother as part of the autopsy. The photograph shows the unborn child lying on a table in a pool of red liquid. "The unborn child in the photograph appears tiny, innocent, and vulnerable. Society's natural inclination is to protect the innocent and the vulnerable."

*Reese v. State*, 33 S.W.3d 238, 242 (Tex. Crim. App. 2000); *see Rolle*, 367 S.W.3d at 751; *Erazo*, 144 S.W.3d at 495. As counsel for Fields argues, the photograph is "toxic." I agree. The content of the photograph is so toxic that the prosecutor felt compelled to warn courtroom spectators before the photograph was published. The image appeals solely to the jury's emotions and encourages a decision on an improper basis. This factor weighs strongly in favor of exclusion.

*Time to develop the evidence*

The State asked relatively few questions of the medical examiner regarding the photograph, and this factor weighs in favor of admissibility.

*The State's need for the evidence*

In addressing this factor, we are to consider (1) whether the State had other available evidence to show the fact of consequence that the photograph was relevant to show; (2) if so, how strong was that other evidence; and (3) whether the fact of consequence related to an issue that was in dispute. *Erazo*, 144 S.W.3d at 495–96; *Montgomery*, 810 S.W.2d at 390.

The only fact of consequence the photograph was relevant to show was that Baby Girl Harrison's unborn child died. That fact of consequence was not in dispute. Moreover, that fact was established by the testimony of several witnesses, including Dr. Samantha Evans, a forensic pathologist in the medical examiner's office. Dr. Evans testified Baby Girl Harrison had been twenty-one to twenty-two weeks pregnant when she died, and that, although "the generally accepted time frame" for "when a baby is viable ... is about twenty-four weeks" of gestation, the unborn child was "an individual" within the meaning of the relevant Texas law. Dr. Evans testified that as part of the autopsy, she removed the unborn child from the mother's uterus and found no abnormali-

ties or defects that would have caused its death. Dr. Evans testified that the mother's death is what caused the unborn child's death. The State had Dr. Evans identify the photograph as being of the unborn child she removed from the uterus of Baby Girl Harrison, but did not use the photograph to explain or add anything helpful to Dr. Evans's testimony. Fields did not cross-examine Dr. Evans or present any controverting evidence on these issues.

The autopsy photograph could conceivably have been relevant to show by inference that Fields knew Baby Girl Harrison was pregnant. However, the State presented three witnesses who testified Fields knew she was pregnant. Fields did not deny or controvert that evidence and never disputed or argued that he was not aware Baby Girl Harrison was pregnant.

In sum, State's exhibit 89 was not relevant to any disputed fact of consequence. With respect to the facts to which the photograph was relevant, the State had other strong, uncontroverted, and admissible evidence with which to establish its case. The photograph was therefore completely unnecessary, and this factor also weighs strongly in favor of exclusion.

### Conclusion

The majority appears to hold that an autopsy photo of a victim is always admissible over a rule 403 objection if it shows a victim of the offense charged unless it depicts mutilation of the victim caused by the autopsy. That conclusion completely discounts the other three factors in the rule 403 analysis, two of which—the potential for prejudice and the State's need for the evidence—weigh strongly in favor of exclusion in this case. Where, as here, the nature of the photograph is such that its content will surely inflame the jury's passions and where the photograph, although relevant, is not probative of any issue in dispute and the State has shown no particular need for the evidence, the trial court abuses its discretion in admitting the photo. I therefore disagree with the majority's conclusion on this issue and would hold the trial court abused its discretion by admitting State's exhibit 89. However, I have reviewed the entire record and conclude that the error, even when considered together with the improperly admitted note, State's exhibit 3, did not affect Fields's substantial rights. In light of the evidence as a whole and the arguments of counsel I am fairly assured that the error did not influence the jury's verdict or had but a slight effect. I therefore concur in the judgment.