

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00317-CR

_____

GERRY HANDSBOROUGH, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1396805D

Before Sudderth, C.J.; Pittman and Birdwell, JJ.
Memorandum Opinion by Justice Pittman

## MEMORANDUM OPINION

Gerry Handsborough appeals from his murder conviction and seventy-five year sentence. *See* Tex. Penal Code Ann. § 19.02. In two points on appeal, he challenges the sufficiency of the evidence to support his conviction and the trial court's admission of five photographs over his rule 403 objections. Tex. R. Evid. 403. We affirm.

## SUFFICIENCY OF THE EVIDENCE[1]

Handsborough acknowledges in his first point that the evidence shows someone murdered Eric Peterson, an employee of Military Gun Supply in Fort Worth, but he claims that the evidence is not sufficient to establish that he was the perpetrator.

### I.    Sufficiency Due-Process Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

---

[1]Because Handsborough's first point requires a discussion of the evidence, we dispense with a background section.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## II.     Evidence Adduced at Trial

### A.     The Crime and Police Response

Steven Hunt, a former employee of Military Gun Supply, testified that on December 13, 2014, he was working at the store with Peterson. Business was slow that day, so Hunt had spent time gunsmithing in the back of the store. A few minutes before closing time, which was at 6:00 p.m., he heard "a lot of loud noises" that sounded like fireworks. But he then noticed smoke coming through the warehouse door; when he looked through the office, he saw "broken glass and things broken."

Hunt called out to Peterson, but he did not answer. Hunt grabbed his shotgun and began looking around the storefront and warehouse area. When he circled back to the retail area, he saw Peterson lying on the ground with multiple gunshot wounds, so he locked the front door, grabbed his cell phone to call the store's owner, and simultaneously called 911 from the office phone. He stayed in the retail area until the police arrived at 6:08 p.m.

Although Hunt did not think Peterson was breathing, he still performed CPR. He did not think Peterson was alive when the police arrived. He did not know who shot Peterson and never saw anyone come into the store.

Fort Worth police officer Brian Hardin was dispatched to the gun store in response to the murder. He and Officer Quintana noticed "a good amount of" smoke lingering in the air when they arrived. They backed out, made a tactical plan, and then went back inside. When they found Peterson, they took him outside so that he could get medical attention.

Officer Nicholas Maddock also responded to the call at approximately 6:07 p.m. As he and the other officers entered, he saw "a thick cloud of what [he] kn[e]w . . . to be burned gunpowder." He remembered stepping on and seeing several spent rifle casings that appeared to be from a long rifle. He also saw Hunt doing CPR on Peterson.

A photograph of the outside of the store shows a motorcycle out front; Peterson's mother identified it as his at trial.

4

Officer J.J. Jeanes, a crime scene officer, photographed the scene and dusted the glass countertop in the store room for fingerprints. He had watched the surveillance video of the shooting and deliberately dusted in the location on the countertop where the shooter had placed his hands flat with his fingertips on glass.[2] He was able to lift several latent prints. Jeanes collected thirty-four bullet casings.

Peterson died from multiple high-velocity gunshot wounds to the chest.

## B. Store's Surveillance System Reveals a Person of Interest

Sergeant Billy Randolph, Jr. was called to preserve video footage from the store's surveillance cameras. Randolph downloaded video footage for December 11th, 12th, and the 13th. He noted that the system had incorrectly recorded time, a common problem with surveillance systems; this system was an hour ahead. The State published the surveillance footage that Randolph preserved for the jury.

Randolph explained that at 5:56 p.m. on December 13th, a person came into the store and purchased an item; Randolph thought the person acted strangely because he walked right up to a shelf, pulled off an item, and immediately walked to the counter. Randolph said that in his experience, a person needing gun parts would have needed to check that the part was the correct type for the particular gun, indicating to him that the person in the video had been in the store before.

---

[2]The officer who reviewed and preserved the surveillance video testified that the shooter was wearing gloves.

5

At 5:58 p.m., what appeared to be the same person walked back into the store, shot Peterson, spraying the area around Peterson and an enclosed office area. This person, a black male, was wearing a gas mask and the same clothing—dark colored clothes, a hoodie, and a tan, knit cap—as the person who had made the 5:56 p.m. purchase. He looked bulkier, however, and Randolph thought that the shooter had been wearing additional clothing or a bulletproof vest underneath the outer clothing.

Based on the surveillance footage and the shell casings found at the scene, officers determined the shooter had used an AR-15 with a flashlight or laser attachment and a dual drum magazine. The 5.56 rounds recovered were stamped "Lake City Ordinance."

After comparing video from the 11th and 12th of December with the 13th, Randolph thought that the person who had bought an item on the 13th (and, in his opinion, the shooter) had also been in the store on the previous two days. On the 11th, that person could be seen holding a gun; he held it in the same, identifiable way the shooter had. Randolph explained that manner to the jury:

> Q. Why does the manner in which he's holding that firearm stand out to you?
>
> A. Most people are going to shoulder a weapon and they're going to shoulder it the same way.
>
> So if I'm using my rifle, I'm going to shoulder it. If I'm using my shotgun, I'm going to shoulder it. Where I place it, it's not going to be the same as somebody else. Somebody else may place it further in the pocket of the shoulder.

6

In this case he positions it high, so if you look at the . . . stock of the gun is actually sitting about that far above his shoulder.

On the 12th, around 5:56 p.m., that person bought a dual-drum magazine of the type that could be attached to an AR-15.

## C. Police Issue Press Release With Handsborough's Photo

Detective Matthew Barron testified that when watching the surveillance video from the 13th, he noticed that the shooter came into the store only sixty-eight seconds after the last-minute customer had come in and left. The shooter and customer appeared to be dressed identically: "the things that we saw were this pullover-type shirt here, specifically the emblem over here, this watch-style cap here, and on a different angle and some turns when slowing it down that the tennis shoes looked identical." Because of the similarity in dress and physical build, and the timing of the shooting, Barron believed the shooter and customer were the same person.

Barron used still photographs from the surveillance footage to issue a press release to media outlets on December 14, 2014. At trial, Handsborough's mother identified Handsborough as the person shown in the photographs.

## D. Handsborough's Mother Calls 911

On the morning of December 15th, Handsborough's mother called 911 and told the operator she had seen something on the news about her son. She knew the police wanted to speak to the person who had been at the gun store. She told the operator that Handsborough had told her that on the 13th, he had been robbed at the

gun store. He told her that he had bought a speed loader, and when he went back to his car, someone hit him in the head, knocked him out, and took all of his clothing and an AR-15 and a cell phone he had in the car with him. According to Handsborough, he woke up at Lake Arlington with no clothes on. But he was able to find his car nearby and drove to his cousin Jabborr Williams's apartment in Fort Worth.

Handsborough was with his mother when she made the call. Although she was not at home, she arrived at her house within an hour to meet with detectives. Handsborough went home with her but left before the detectives arrived.

Although Handsborough's mother had seen him on December 13th, he did not tell her anything about the robbery at that time, and he appeared "physically all right." She admitted at trial that he went to Military Gun Supply often.

### E. Detectives Find Additional Evidence Connecting Handsborough to the Murder

Barron interviewed Handsborough's mother about forty minutes after receiving the December 15th 911 call. She told Barron and another investigating detective that she recognized Handsborough's hoodie because she had bought it at Walmart.

Handsborough's mother consented to a search of the home where she and Handsborough lived. The detectives found a box for an AR-15 and a reflex sight that would be mounted on that type of weapon. They discovered that the gun had been purchased from an Academy Sports store in Arlington.

8

Handsborough's mother admitted at trial that she had bought an AR-15 for Handsborough at Academy about two to three weeks before the murder. He had been with her at the time. The jury was able to view video showing the purchase.

After talking with Handsborough's mother, officers found Handsborough's car at Williams's apartment. In the car, they found a camouflage hoodie that looked similar to the one the shooter wore in the video, a gas mask, and the bag for the gas mask.

Officers also searched Williams's apartment. They found a high capacity drum magazine and a user manual for it. Handsborough's mother admitted at trial that he had bought a drum magazine as an attachment for his AR-15. In a second search of Handsborough's residence, they found a manual for an AR-15 under a mattress in a bedroom where they also found Handsborough's social security card. They also found a 5.56 ammunition box in a trash bin behind the residence.

Officers took samples of Handsborough's fingerprints. In March 2015, a latent print examiner at the Fort Worth Crime Lab compared the prints Jeanes took from the countertop at the gun store to Handsborough's prints; the left ring fingerprint matched.

### F.    Cell Phone Evidence

FBI Special Agent Mark Sedwick, a member of the Cellular Analysis Survey Team, analyzed cell phone data for numbers associated with Handsborough[3] and Williams.  At 6:05 and 6:06 p.m. on December 13, 2014, Handsborough's cell phone pinged a tower with a coverage area that included the crime scene.  Sedwick could exclude Handsborough's residence as a potential location for the cell phone at that time because it would not have pinged that particular tower.  At 6:16 p.m., the phone had moved toward Williams's apartment.  Additionally, the records showed calls were made from that cell phone to Williams's cell phone at 6:05, 6:06, and 6:16 p.m.

## III.    Evidence of Identity Sufficient

Handsborough's argument focuses on what the evidence does not show: it does not show that he had a motive for the murder, that he owned a bulletproof vest, or that the gas mask contained gunshot residue.  But we do not view the evidence for sufficiency purposes based on what might be lacking; instead, we must consider whether in reaching their verdict, the jurors made reasonable inferences from the "combined and cumulative force of all the evidence." *See Hooper v. State*, 214 S.W.3d 9, 15, 17 (Tex. Crim. App. 2007).

We conclude that the jury did so here. Handsborough was confirmed on video as being at the gun store immediately before the shooting; he placed himself there

---

[3]Handsborough's cell phone account was in his mother's name, but he had previously listed it as his number on a traffic ticket.

with his attempted alibi, which the jury was free to disbelieve. Handsborough and the shooter were wearing the same clothing. Fingerprint evidence confirms his presence at the scene and his identity as the shooter; the jury could reasonably infer that even if Handsborough had been wearing gloves, they might not have covered his entire hand. Handsborough owned the same type of weapon that was used in the shooting. The location in which the drum magazine and manuals were located showed an attempt to hide them. Additionally, Handsborough left his home before the detectives could arrive and question him, which the jury could consider as some evidence of guilt. *See, e.g.*, *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989). Finally, cell phone evidence supports that Handsborough not only was the shooter, but instead of being driven to Lake Arlington around the time of the murders, was driving to Williams's apartment, where some of the evidence was found.

We hold that the evidence is sufficient under the appropriate standard of review to prove that Handsborough murdered Peterson. We overrule his first point.

## PHOTOGRAPHIC EVIDENCE PROPERLY ADMITTED

In his second point, Handsborough complains that the trial court improperly overruled his timely rule 403 objections to three photographs showing shell casings lying in blood—which he contends were inflammatory and calculated to create an emotional reaction in the jury—and photographs of the drum magazine box and manual seized from Williams's apartment—which he argues have no connection to him. From Handsborough's objections and the trial court's responses, we discern

11

that the trial court understood the rule 403 objections to focus on the photographs' potential for unfair prejudice. *See State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013).

Even if evidence is admissible under other rules, it may nevertheless be inadmissible under rule 403 if its probative value is substantially outweighed by a danger of unfairly prejudicing the defendant. Tex. R. Evid. 403. The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996).

## I.    Shell Casing Photographs Admissible Under Rule 403

When the evidence challenged is a photograph, a court may consider many factors in determining whether the photograph's probative value is substantially outweighed by its inflammatory nature: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether a body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Exhibits 44 and 45 are close-up shots of the floor where certain shell casings were found behind the counter. They show mostly the blood on the floor next to the shells; the blood appears to have partly congealed. Exhibit 43 shows the full area

12

behind the counter, the location of the eight shells found there, and the pool of blood.

Although the photographs are gruesome and Exhibits 44 and 45 show the blood in detail, and although there are several other photographs of the various locations of the numerous shell casings found at the scene, we cannot say that the trial court abused its discretion by admitting the three photographs. The photographs give context to Jeanes's description of the scene, help explain the way in which the investigation discovered additional links to Handsborough through the type of weapon used, and give credence to the manner in which Jeanes processed the scene. *See Fields v. State*, 515 S.W.3d 47, 56 (Tex. App.—San Antonio 2016, no pet.). We hold that the trial court did not abuse its discretion by overruling Handsborough's rule 403 objection to Exhibits 43 through 45.

## II.    Drum Magazine Box and Manual Photographs Also Admissible

Handsborough contends the photographs of the drum magazine box and manual that were seized from his cousin's apartment were unfairly prejudicial because "the [S]tate offered no evidence to tie these two exhibits" to him.

When considering if evidence is admissible despite a rule 403 objection, a court must consider (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence and balance those factors against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any

tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Alami v. State*, 333 S.W.3d 881, 889 (Tex. App.—Fort Worth 2011, no pet.).

Here, the State presented evidence that Handsborough owned an AR-15 and a drum magazine—the same type of weapon and attachment that the shooter used, that calls were made from Handsborough's cell phone number to Williams's cell phone number immediately after the murder, that Handsborough's cell phone was located heading toward Williams's apartment immediately after the murder, and that Handsborough's car was found at Williams's apartment two days after the murder. Thus, the State showed Handsborough's link to the evidence and the apartment where it was found.

The State had a need for the evidence, as Handsborough's first point demonstrates. This was a circumstantial case, and evidence linking Handsborough to the scene and the weapon used was necessary. The only eyewitness was the deceased. The State's evidence showed a link between Handsborough and the evidence found at Williams's apartment and, therefore, when compared to the evidence's probative value, diminished any likelihood that the jury would have been prejudiced or convicted on an improper basis. Thus, we hold that the trial court did not abuse its discretion by admitting the evidence over Handsborough's rule 403 objection.

14

We overrule Handsborough's second point.

## CONCLUSION

We affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 13, 2019