**Affirmed and Memorandum Opinion filed July 27, 2023**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00275-CR

**ISRAEL TORRES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 230th District Court
Harris County, Texas
Trial Court Cause No. 1619255**

### MEMORANDUM OPINION

Appellant Israel Torres raises three issues challenging his conviction for the aggravated robbery of complainant Alexis Sanchez[1], resulting in a twelve-year prison sentence. Appellant complains that the trial court erroneously admitted evidence over his objections that it was irrelevant and that its prejudicial effect outweighed its probative value. Appellant further asserts that the evidence at trial

---

[1] Complainant's full name is Alexis Sanchez-Torres, but the indictment refers to him as Alexis Sanchez.

was legally insufficient to prove that he was one of the three assailants. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was arrested on January 22, 2019. He was charged with aggravated robbery with a deadly weapon in connection with events that occurred three days prior to his arrest. He pleaded "not guilty" to the offense and his case was tried before a jury.

At trial, complainant and several other witnesses identified appellant and testified to appellant's participation in the robbery and that appellant and his brother had argued with complainant the day before the robbery occurred.

Complainant testified at trial that on the night of the offense he was sitting at home "about a roll up a blunt"—a marijuana cigarette—with one of his neighbors when, as he puts it, "my door slams open, and I look and see people in my doorway with guns and they're like, man, give me all your stuff." He recalled three people standing in his doorway, wearing black ski masks, and pointing guns at him. When asked about how this sudden appearance of uninvited guests made him feel and he explained:

> Q. Okay. At that point how do you feel?
>
> A. I was, like, shocked. I was like: Hey, who's this? Who came inside my house like this? At first I thought it was my friends just messing with me.
>
> Q. Okay. And then what was your afterthought?
>
> A. Well, at first whenever I thought it was my friends, I just looked away. And I guess since they thought I was joking, like I looked at them as a joke. They're like: Man, you think we're playing with you or what? And that's when I looked at them again and I was like, I don't know these people. They're trying to get me.
>
> Q. Okay. You mentioned earlier that they made a statement. What did they say?

A. "Give me all your stuff. Give me all your shit."

Q. Okay. And at that point, did you feel threatened?

A. Yeah, they were really here to get me.

Q. Did you feel that they were trying to take away your stuff?

A. Yeah.

Q. And which stuff --

A. More than that, they probably would've done more than that.

But the threat of violence was not unforeseeable to the complainant and safety measures had been taken. According to the complainant there were rumors that someone wanted to rob him, which he reasoned owed to the fact that he "had a lot of jewelry and stuff like that." He explained, moreover, "I live in a bad neighborhood." Plus, he was in the business of selling drugs out of his residence. Complainant had taken defensive measures such as acquiring night vision cameras which he installed outside his home, a semiautomatic handgun which was in his pocket, and an AK-47 assault rifle which was under the table where he was rolling the blunt.

Q. Okay. What is your reaction once you see people in masks and guns?

A. I was, like, all right, I'm going to give you all my stuff. And then I just acted like I was getting up. When I start getting up, I just reached for my gun.

Q. Which gun are we talking about?

A. My .10 millimeter Glock that I had in my pocket.

Q. And show us how you're sitting, just sitting like this --

A. Yeah, I was just like this, just sitting normal.

Q. Okay. Where are your hands located?

A. Well, I'm getting up. I'm like -- you know, I decided to get up slowly and I'm reaching down and I just grab -- I had the handle sticking out of my pocket.

Q. Okay. Once you reach out to it, what do you do?

A. I just take it out and look down at the table and I start shooting.

Complainant further explained that as he began firing rounds from his handgun, the assailants ran from his doorway. Complainant continued to fire as the assailants ran. After he fired the only four rounds in his handgun he began shooting the AK-47. He recalled that he heard return gunfire and he continued outside behind his fence-line firing the AK-47. He believes he had shot two of the assailants who had fallen to the ground when he depleted his first magazine in the AK-47. He returned to his house to grab another clip. He recalled seeing the second assailant he had shot crawling down the street to the right. Complainant testified that when he ran back out to pursue his assailants a neighbor prompted him to see that someone was dead, and has he put it, "I snapped out of it. I looked back and I'm like: Damn, this guy's really dead." After the police and ambulance arrived, he watched the EMS find the individual crawling in the direction to the right whom he identified as appellant.

The complainant further explained that he knew appellant and had been in an argument with appellant and his brother the previous day.

A neighbor on Sherman Street, Roger Perez, testified about the events he saw occur after hearing the gunshots when he walked out on the street. He explained that he witnessed a man wearing black crawling on the sidewalk, and that he saw him remove gloves and discard the gloves and a handgun before the police arrived. Perez explained that he directed the police to the man and the discarded items.

Appellant also testified at trial. He explained that he had told the police that he had gone to purchase weed from the complainant and that he and complainant were being robbed.

4

Q. And you told them at that time that you were walking with your friend. What happened to the friend?

A. Not walking, but the person I was purchasing weed from, I was concerned about him. I was telling him that I'd been robbed and the person, the complainant, [], was being robbed as well.

As we all know, three men was coming out of there, ski masked up. So I never told them I was walking, but I'm really trying to tell them check on my friend, [complainant]. He's not like just a friend, but he's a familiar -- he sells me marijuana.

Q. So when he was robbed, what --

A. Three men -- three masked men --

Q. So you mentioned here that you were robbed --

A. Right.

Q. -- along with your friend?

Appellant contended that he was caught in the gunfire, and was shot on the ground, but acknowledged that gloves were found in the vicinity, and admitted that one of the men who had been at the scene found dead was his brother. Appellant admitted that he was found wearing black, white-striped, adidas attire. When asked about the surveillance video, appellant testified as follows:

Q. So you've seen this surveillance video. Right?

A. Yes, ma'am.

Q. Okay. And while watching it, did you observe the third individual on that video?

A. Yes, ma'am.

Q. What kind of outfit is he wearing?

A. He was wearing -- what I see now, black. He was wearing black.

Q. Did you see those stripes on the side?

A. No, ma'am. I'm having stripes. Now, you're pinning me and you're going to confuse the jury.

Q. Okay. I'm sorry. Yes or no, that's the question.

A. No, ma'am, I had stripes. You never seen stripes on the video.

Q. So I'm talking about the surveillance video.

A. Right.

Q. On the surveillance video, the third individual had stripes on the side of his shirt?

A. You never showed the stripes.

Q. And that day you were also wearing Adidas shirt with stripes on the side?

A. Can we bring the video back?

Q. Did you also wear pants with stripes on the side?

A. Correct.

At trial, the State showed footage from the above-referenced surveillance cameras outside complainant's house, footage from a police body-worn camera, and a number of photographs from the crime scene, all of which were admitted into evidence and presented to the jury. Color video footage from the body-worn camera shows appellant on the sidewalk wearing a black, white-striped tracksuit, and monochromatic video footage from complaint's night-vision surveillance cameras show one of the assailants wearing an identically striped tracksuit.

Appellant's objections to the admittance of State's Exhibits 107, 108, and 113 were overruled, and the evidence was briefly presented to the jury. All three exhibits were crime-scene photographs depicting bullet holes in nearby buildings.[2]

The jury returned a guilty verdict for aggravated robbery with a deadly weapon and assessed a sentence of twelve (12) years' confinement. The trial court entered judgment in accordance with the verdict and punishment assessment. This appeal followed.

## II. ISSUES AND ANALYSIS

Appellant complains that (1) the trial court erred in admitting irrelevant

---

[2] Exhibits 107 and 108 show one building (white); Exhibit 113 shows another (red).

evidence, (2) the trial court erred in admitting evidence whose prejudicial effect outweighed its probative value, and (3) the record contains insufficient evidence to support his conviction. Though he has briefed it last, we first address appellant's legal sufficiency complaint because, if meritorious, it would afford appellant the greatest relief.

**A. Is the evidence sufficient to support appellant's conviction for aggravated robbery?**

In his third issue, appellant complains that the record contains insufficient evidence to support his aggravated robbery conviction. In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

We measure sufficiency to support a conviction by comparing the evidence

7

presented at trial to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge reflects the governing law, the indictment, the State's burden of proof and theories of liability, and an adequate description of the offense for the particular case. *Id.*

"A person commits [robbery] if, in the course of committing theft . . . and with the intent to obtain or maintain control of the property, he . . . threatens or places another in fear of imminent bodily injury or death." Tex. Penal Code § 29.02(a) & (a)(2). A robbery is aggravated if a person "commits robbery as defined in Section 29.02 and he . . . uses or exhibits a deadly weapon." Tex. Penal Code § 29.03(a) & (a)(2). "A person commits [theft] if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.03(a).

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Fang v. State*, 544 S.W.3d 923, 928 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). A lack of direct evidence is not dispositive of the issue of guilt. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can suffice. *Id.*

Several witnesses, including complainant, identified appellant as one of the assailants. The complainant testified, with the support of his surveillance footage, that three masked men appeared at his door with guns threatening him and demanding his "stuff". He identified appellant as one of these men. *See Walker v. State*, 180 S.W.3d 829, 832–33 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("A conviction may be based on the testimony of only one eyewitness."). The monochromatic video footage shows that the third man was wearing a stripped

8

adidas tracksuit and that this individual was carrying a handgun and pointing it toward complainant through the doorway. Complainant testified that he was afraid for his life, and his subsequent actions—firing upon the assailants—were based on that fear.

Footage from the surveillance cameras outside of complainant's house showed one of the assailants wearing a tracksuit identical to the one worn by appellant as shown in body-worn camera footage recorded by a responding officer. A firearm and gloves matching those used in the robbery were found near appellant's unconscious body, and Roger Perez testified that he saw appellant discarding these items before the police arrived. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that "[a]ttempts to conceal incriminating evidence. . .are probative of wrongful conduct and are also circumstances of guilt.")

Appellant argues that the State failed to prove that appellant was one of the assailants because the State failed to provide fingerprints, DNA, and gunshot residue (GSR) wipe test of appellant's hands. But the State was not required to make such a showing; Appellant has not cited authority for the proposition that proof of any or all of the above factors were necessary to reach the threshold of proof to identify defendant as an assailant. Our law relating to the sufficiency of evidence necessary to identify those criminally charged is demanding of certainty without limiting the state to specific forms or types of evidence. *See e.g., Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd)(noting that DNA evidence was not required); *see also Williams v. State*, 196 S.W.3d 365, 369 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)(affirming robbery conviction on sufficiency challenge where there was evidence available to support jury's finding, but no DNA evidence, no fingerprint evidence; no other

witnesses (beside the complainant) to the robbery; no line-up performed; and where it dark at the time of the robbery, likely limiting visibility of complainant); *see also Melgar v. State*, 593 S.W.3d 913, 921 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) (concluding positive sufficiency finding supported by inferences built on fact established that no other person could have committed the murder); *see also Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.--Houston [14th Dist.] 2005, pet. ref'd) ("A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint evidence, or evidence of the gun or cash Newby gave to appellant").

Under the applicable standard of review, a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally threatened the complainant with fear of imminent bodily injury or death, by using and exhibiting a deadly weapon, in the course of committing theft and with intent to obtain or maintain control of the property. *See Johnson v. State*, 509 S.W.3d at 324; *Walker v. State*, 180 S.W.3d at 832–33; *Neelys v. State*, 374 S.W.3d 553, 559; *Guevara v. State*, 152 S.W.3d at 50. Finding no merit in appellant's challenge to the sufficiency of the evidence supporting his conviction for aggravated robbery, we overrule appellant's third issue.

## B. Did the trial court reversibly err in admitting State's Exhibits 107, 108, and 113 over appellant's objections?

In his first two issues, appellant complains that the trial court erred because it admitted exhibits—three photographs of bullet holes in houses located at the scene—he contends were not relevant and because the probative value of the exhibits was substantially outweighed by a danger of prejudice.

In a hearing outside of the jury's presence, during the State's case-in-chief, the prosecutor notified the trial court that the prosecutor was "planning to offer

State's Exhibits 107, 108[,] and 113," which are photographs of "bullet holes in the houses in the path of where the shooting was occurring, the same path where [Appellant] was found with a weapon." Appellant objected to the exhibits on the bases of Texas Rules of Evidence 401, 402, and 403, and the trial court overruled the objections.

We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Seidule v. State*, 622 S.W.3d 480, 489 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

### 1. Were State's Exhibits 107, 108, and 113 relevant?

While relevant evidence is admissible unless otherwise indicated by United States or Texas law, "irrelevant evidence is not admissible." Tex. R. Evid. 404. Relevant evidence is evidence which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence. *Gonzalez v. State*, 544 S.W.3d at 370.

In criminal cases, crime scene photographs are almost always relevant

because they 'depict the reality of [the] offense' and may show the manner in which it occurred." *Bradshaw v. State*, No. 01-19-00611-CR, 2020 WL 7062589, at *6 (Tex. App.—Houston [1st Dist.] Dec. 3, 2020) (quoting *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999); *George v. State*, 446 S.W.3d 490, 505 (Tex. App.—Houston [1st Dist.] 2014) (quoting *Chamberlain*, 998 S.W.2d at 237).

Because State's Exhibits 107, 108, and 113 are crime scene photographs that depict the scene as discovered by responding officers, they are relevant. The exhibits are relevant for the reasons argued by the State—they assist the prosecution establish that complainant was deliberately shooting at appellant because he was one of several robbers whom he chased out of his home and fired at as they ran, separated, and began to flee in opposite directions, rather than merely an innocent bystander "caught in the gunfire" as he casually approached Alexis's house from the side to buy marijuana, like appellant claimed. *See Antwine v. State*, 486 S.W.2d 578, 580 (Tex. Crim. App. 1972) (finding photographs of bullet holes in liquor store building where crime occurred and locations of other buildings admissible to aid the jury in better understanding the witnesses' testimony and to help show the overall picture of the crime). The fact that the cause of the bullet holes and whether they were created on the night of the incident are points of disagreement between appellant and the State is, in this case, inconsequential to the relevance of the photographs. Appellant complains that the exhibits were not relevant because no supplementary evidence showed that the bullet holes were related to the incident; however, defendant similarly introduced no evidence at trial that they were *not* related. Therefore, we overrule appellant's first issue.

## 2. Did the prejudicial effect of State's Exhibits 107, 108, and 113 outweigh their probative value?

12

The court may exclude relevant evidence if the probative value of the evidence is substantially outweighed by a danger of unfair prejudice. Tex. R. Evid. 403. Generally, "a proper Rule 403 analysis by either the trial court or a reviewing court includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; (4) the proponent's need for the evidence." *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).

Furthermore, the court's determination regarding the prejudicial effect of photographs, specifically, should include: the number of photographs, the size of the photographs, whether they are in color or black, the detail shown in the photographs, and whether they are gruesome. *George v. State*, 446 S.W.3d 490, 505-6 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Reese v. State*, 33 S.S.3d 238, 241 (Tex. Crim. App. 2000)).[3]

Appellant, using identical reasoning to his relevance objection, complains that a lack of supplementary evidence as to the cause of the bullet holes makes admission of State's Exhibits 107, 108, and 113 more prejudicial than probative. We presume that appellant wishes to argue that even if the evidence is relevant, its probative value is so minimal that it may as well not be. However, a lack of probative value alone does not justify overruling the trial court's decision—the probative value of the evidence must also be *substantially* outweighed by the danger of unfair prejudice.

The photographs at issue, by themselves, have almost no potential for

---

[3] There are several other factors that the court should consider, but are not relevant to this case, including certain details about photographs that show dead bodies. *See* George v. State, 446 S.W.3d 490, 505-06 (Tex. App.—Houston [1st Dist.] 2014).

prejudicial effect. There are only three photographs, none of which show any gruesome content. In fact, appellant and appellee both agree that if the bullet holes were, as appellee alleges, created at the time of the incident, they were created by a firearm used by someone other than appellant. Therefore, the potential to impress the jury in *any* way, irrational or otherwise, is negligible. Even assuming, without holding, that the photographs have no probative value whatsoever, that value is not outweighed so substantially by its prejudicial effect that we can say the trial court abused its discretion.  We overrule appellant's second issue.

### 3. Even if the trial court erroneously admitted evidence, such an error was harmless.

Even if, as appellant complains, State's Exhibits 107, 108, and 113 were irrelevant or unfairly prejudical, such an error was harmless. The Texas Rules of Appellate Procedure states that for non-constitutional errors, we must disregard any error that does not affect the appellant's substantial rights. Tex. R. App. P. 44.2(b). This means that an error is reversible only when it has a substantial and injurious effect on the jury's verdict. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). If an examination of the record as a whole shows that the error did not influence the jury, or had only a slight effect, the conviction should be affirmed. *Id.*

In determining whether an error affected an appellant's substantial rights, the court should consider: "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Id.* We have held that even gruesome or especially provocative photographs may be harmless if the remaining evidence supports the verdict. *See*, *e.g.*, *Rolle v. State*,

367 S.W.3d 746, 753-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (holding that a color autopsy photo of the victim's unborn child was erroneously admitted but that the error was ultimately harmless).

An examination of the record in this case shows that even if the trial court erred in admitting State's Exhibits 107, 108, and 113, the error had no more than a slight effect on the jury's determination. The State did not emphasize the photographs beyond introducing them to the jury, the remaining evidence included recorded footage of the defendant that was much more indicative of his guilt, and the supposed error was not unfairly biased against appellant. Furthermore, the remaining evidence was sufficient to support the jury's verdict. Therefore, even if the trial court had erroneously admitted the evidence at issue, we would still overrule appellant's first and second issues.

## III. CONCLUSION

Because the evidence at trial was legally sufficient to support the jury's verdict, we affirm appellant's aggravated robbery conviction. State's Exhibits 107, 108, and 113 were relevant and not unfairly prejudicial; therefore, we affirm the judgment of the trial court.

/s/ Randy Wilson
Justice

Panel consists of Justices Wise, Zimmerer, and Wilson.

Do not Publish — TEX. R. APP. P. 47.2(b).